IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 15, 1999 Session

## JULIA SLEDGE LEACH BRYAN v. JAMES WENDELL LEACH

**Appeal from the Chancery Court for Maury County**
**No. 91-540     Jim Hamilton, Chancellor**

---

**No. M1998-00922-COA-R3-CV - Filed June 5, 2001**

---

This case involves post-divorce disputes over alimony and child support and issues of contempt of court. The father commenced this appeal after the trial court declined to modify or terminate his alimony obligation and awarded the mother more than $50,000 in child support arrearages and, later, found the father in contempt of court and ordered him to pay a fine of $100 per day until all judgments were paid to the mother. On appeal, the father argues that his alimony obligation should have terminated or decreased, that a portion of his child support payments should be placed in trust for the benefit of the children, and that the trial court erred by fining him for contempt. We affirm the trial court's orders but modify the fine imposed upon the father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Wm. Kennerly Burger, Murfreesboro, Tennessee, Gregory D. Smith, Nashville, Tennessee, for the appellant, James Wendell Leach.

James DuBois, Columbia, Tennessee, John A. Day, Nashville, Tennessee, for the appellee, Julia Sledge Leach Bryan.

### OPINION

James Wendell Leach ("Father") and Julia Sledge Leach Bryan ("Mother") married in 1980, shortly after Father began his medical practice in Columbia. The parties divorced in 1992 after twelve years of marriage; they have three children.[1]  Father is an obstetrician/gynecologist who

---

[1]The exact dates of birth are not clear from the record, although Mother testified in March of 1998 that the
(continued...)

earns in excess of $400,000 annually. At the time of the marriage, Mother held a nursing degree from Vanderbilt University. Since then, she has maintained and enhanced her skills.

At the time of their divorce, the parties entered into a detailed Marital Dissolution Agreement ("MDA"). Under the agreement, Mother was given custody of the children, and Father had reasonable visitation. Father agreed to pay $1,750 per week in child support "until each child is 22 years of age provided they are enrolled annually in and attending college full-time." Father also agreed to pay private school tuition and to pay "college expenses, including room, boarding, tuition, books and supplies, and other expenses related to college until each such child graduates from college." Further, Father agreed, "As each child reaches the age of 16, [to] provide an automobile for such child and [to] be responsible for all expenses related to the use and maintenance of same . . . until the youngest child reaches the age of 22."

Mother received the marital home and its contents and Father agreed to pay:

as additional child support until the youngest child reaches the age of 22 all expenses related to maintaining, repairing and/or replacing all improvements located therein and thereon (including appliances, machines and equipment), and all other expenses related to the residence, yard, swimming pool and other improvements. The necessity for said expenses shall be determined by [Mother] in her sole and absolute discretion.

Mother also received her car and van and, as "additional child support," Father agreed to pay for "all gas, oil, insurance, maintenance, repairs, replacement of tires, batteries and other accessories, and/or other debts thereon, including lease payments" and "[a]t the expiration of the lease on the 1990 Lexus, . . . [to] provide [Mother] with a similar automobile by purchase or lease and [to] continue to do so every three (3) years until the youngest child reaches the age of 22."

In addition, Father agreed to pay health insurance for Mother and the children until the youngest child reached the age of 22 and to pay for any of their medical expenses not covered by insurance. He also agreed to "irrevocably designate [Mother] as the sole beneficiary" of his life insurance policy and to "remain liable for the payment of all premiums on same, if any." Father agreed to pay for a term life insurance policy for Mother until the youngest child reached the age of 22.

Mother received her Individual Retirement Account and Keogh Plan and $332,807.50 from an investment portfolio. Additionally, Father agreed to pay Mother "rehabilitative alimony in the amount of $5,569.00 per month . . . for a period of twenty (20) years." He further agreed, "Such amount shall not be subject to modification or termination."

---

[1](...continued)
children were seventeen, fourteen and nine years old.

In exchange for all the provisions listed above, Father retained, among other things, his Individual Retirement Account and Keogh Plan, the commercial real property which housed his office, and his medical practice, including "any cash, checking accounts, furniture, fixtures, equipment, machinery, supplies, Columbia Diagnostic Associates, Physicians Equipment Partners, Ltd, and accounts receivable." Each of those items was retained in its entirety, free from any claims by Mother.

The MDA also contained the following provisions:

Should there be any obligation, alimony, child support or other, due in the future, after the death of [Father], the children and [Mother] shall have a claim against the estate of [Father] for monies due in the future under this agreement.

* * *

In the event of a breach of this agreement by either party, the party breaching said agreement agrees to pay all expenses of the nonbreaching party, including reasonable attorney's fees.

The agreement was incorporated into the divorce decree issued on January 27, 1992. The parties later agreed to modify the MDA, and in June 1996 the court approved a consent order reflecting, among other things, the parties' agreement that Father be released from certain responsibilities required under the initial Marital Dissolution Agreement, including the purchase or lease of a new vehicle for Mother every three years and the maintenance of the home and vehicle. The parties also agreed to divide certain medical expenses for the children, and Father remained liable for only half of Mother's medical expenses not covered by insurance. In exchange for these modifications, Father agreed to pay Mother an additional $300 per week in child support, making his obligation $2,050 per week.

In October 1996, the trial court issued a consent order to change custody because the oldest child had chosen to live with Father. The order vested Father with primary physical custody of the couple's daughter. In conjunction with that change, the parties agreed that Father's "weekly child support obligation shall be reduced . . . from $2,050 per week to $1,355 per week, which amount takes into account [Father's] obligation to support the parties' other two minor children in the amount of $1,600 per week and [Mother's] obligation to support [the older daughter] in the amount of $245 per week. When [the older daughter] reaches the age of 18, and has graduated from high school, [Father's] support obligation shall be readjusted to reflect that he is no longer entitled to an offset for [her] support."

The daughter returned to Mother's home to live in February of 1997, but Father continued to pay the reduced support amount. On March 7, 1997, Mother filed a petition for change of custody and increase in child support after the daughter decided to resume living with her. Two months later, Father filed a petition for termination of alimony based on Mother's remarriage in April 1997.

He also argued that his obligation to pay alimony should cease because Mother's financial situation had improved due to his payments to her, while his earnings had decreased.[2]

Father had remarried in March 1993 to a woman with two minor children, and in 1996 Father and his family had moved into a larger, more expensive house. Mother remarried in April 1997, to a certified flight instructor, who earned approximately $14,000 annually.

At the May 1998 hearing, Father testified that he had greater expenses, including spending over $22,000 per month on his new household and the larger house. He testified that he owned $620,000 in real estate and his personal property was worth approximately $150,000. He also testified that he had to work more hours in order to maintain his level of income due to changes in medical practice in the area. Testimony at the hearing also revealed that Mother's estate had increased dramatically with the rise of the stock market. Her net worth was over one million dollars and she had paid off the mortgage on the family home. Mother testified that from the divorce to the time of trial, she had filed four contempt petitions based on Father's failure to pay his obligations under their agreement.

In its order, the trial court found that Mother's remarriage did not affect her alimony and that Father had failed to prove any material change of circumstance warranting a modification or reduction of alimony. The court further found that Father had failed to prove a material change in circumstance warranting a change in child support and ordered him to resume weekly payments of $2,050, later assessing arrearages of $46,200 for the time after the older daughter returned to Mother's custody.

The court also found Mother's contempt petition to be "well taken insofar as [Father] has failed to pay or reimburse [Mother] for medical and educational expenses previously ordered by this Court." However, it declined to find Father in "willful contempt" or to impose a penalty, instead awarding Mother a judgment for $5,581.92 for the accumulated arrearages. Mother later filed another petition for nonpayment of child support and for expenses unpaid since the court's last order and for Father's failure to pay the amounts previously ordered. Father requested that a portion of the child support payments be placed in trust for the children's future needs.

In its order following the hearing on contempt, the trial court found Father in willful contempt for failure to pay amounts he had been previously ordered to pay. The court denied Father's motion for stay of judgment[3] and ordered him to pay $100 per day for every day he failed to pay the judgment in full. The trial court denied Father's motion that a portion of the child support be placed in trust.

_____

[2]Father's testimony at the March 1998 hearing indicated that his earnings had not, in fact, decreased. Rather, he testified that he earned approximately the same income, but that he worked longer hours in order to earn it.

[3]This court also denied Father's motion for a stay pending appeal.

On appeal, Father challenges (1) the trial court's refusal to terminate or modify his alimony obligations, (2) the trial court's refusal to order that a portion of his child support payments be placed in trust, and (3) the trial court's sanctions for contempt.

## I. Alimony

Father advances several theories for the termination of his alimony obligation. The first is that Mother's remarriage automatically terminated his alimony obligation.

### A. Automatic Termination Upon Remarriage

In making this argument, Father relies upon Tenn. Code Ann. § 36-5-101(a)(2)(B), which provides, in pertinent part:

> In all cases where a person is receiving alimony *in futuro*, or alimony the amount of which is not calculable on the date on which the decree was entered, and that person remarries, the alimony *in futuro* or alimony the amount of which is not calculable on the date the decree was entered, will terminate automatically and unconditionally upon the remarriage of the recipient.

This statutory provision was enacted in 1994 and became effective April 24, 1994, *see* 1994 Tenn. Pub. Acts, ch. 96, more than two years after the parties signed their marital dissolution agreement. For purposes of this argument, Father characterizes the alimony provided for in the MDA as *in futuro* or "alimony the amount of which is not calculable on the date on which the decree was entered."

Father's reliance on the automatic termination upon remarriage provision of Tenn. Code Ann. § 36-5-101(a)(2)(B) is misplaced because (1) the statute's enactment postdates the parties' agreement and the divorce decree and (2) the statute, by its terms, applies only to alimony *in futuro*, and the alimony involved herein was not of that type.

Because Tenn. Code Ann. § 36-5-101(a)(2)(B), the statute providing for automatic termination of *in futuro* alimony upon remarriage by the recipient, was enacted in 1994, we will not apply it retroactively to an agreement made and a divorce granted in January 1992. *See Waddey v. Waddey*, 6 S.W.3d 230, 232 n. 1 (Tenn. 1999) (because the statutory introduction of rehabilitative alimony was a substantive change, that provision is not applicable to divorces prior to that 1983 act). In *Hays v. Hays*, 709 S.W.2d 625 (Tenn. Ct. App. 1986), this court held that the 1984 statute creating a "duty of rehabilitation" will not be applied to divorce decrees entered prior to its passage, relying on the longstanding legal principle that statutes changing substantive rights will not be given retrospective application. *Hays*, 709 S.W.2d at 627; *see also McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992) (rehabilitative alimony statute does not apply retroactively to alimony awards made prior to its passage).

Statutes are to be applied prospectively "unless the legislature clearly indicates to the contrary." *Shell v. State*, 893 S.W.2d 416, 419 (Tenn. 1995) (citing *Woods v. TRW, Inc.*, 557 S.W.2d 274, 275 (Tenn. 1977)). More significantly, when a statute creates a new right, eliminates a vested right, or impairs a contractual obligation, its retrospective application is constitutionally forbidden. Tenn. Const. Art.1, Sec. 20; *Collier v. Memphis Light, Gas & Water Div.*, 657 S.W.2d 771, 775 (Tenn. Ct. App. 1983). Courts will not apply a statute retroactively where to do so would disturb a vested right or contractual obligation. *Kuykendall v. Wheeler*, 890 S.W.2d 785,787 (Tenn. 1994). Our Supreme Court has construed Article I, section 20 as prohibiting laws "which take away or impair vested rights acquired under existing laws or create a new obligation, impose a new duty, or attach a new disability in respect of transactions or considerations already passed." *Doe v. Sundquist*, 2 S.W.3d 919, 923 (Tenn. 1999). Further, a "vested right," although difficult to define with precision, is one "which it is proper for the state to recognize and protect and of which [an] individual could not be deprived arbitrarily without injustice." *Id*.

Both these principles have been applied to disallow the application of Tenn. Code Ann. § 36-5-101(a)(2)(B) to decrees entered prior to the statute's passage. *Kline v. Kline*, No. 03A01-9706-CV-00240, 1997 WL 677943, at *2 (Tenn. Ct. App. Nov. 3, 1997) (perm. app. denied May 26, 1998) (Tenn. Code Ann § 36-5-101(a)(2)(B) could not be applied to alimony awarded in 1991, and alimony was not automatically terminated by wife's remarriage in 1996); *Hussey v. Hussey*, No. 01A01-9504-PB-00181, 1996 WL 165512, at *5 (Tenn. Ct. App. Apr. 10, 1996) (perm. app. denied Aug. 26, 1996) (parties intended that alimony obligation would not terminate upon remarriage of wife and statute will not be applied retroactively to deprive her of her right to receive payments).[4]

The statutory provision automatically terminating certain types of alimony upon remarriage was not in existence at the time of the parties' agreement or the entry of decree of divorce incorporating that agreement. We will not apply Tenn. Code Ann. § 36-5-101(a)(2)(B) retroactively to create an automatic termination of contractual obligations undertaken and rights vested prior to its enactment.

Additionally, Father's argument that his alimony obligation terminated automatically upon Mother's remarriage, by operation of the statute, must fail because the statute applies only to alimony *in futuro*. As explained below, we conclude that the alimony established by the parties in their marital dissolution agreement and incorporated into the divorce decree was not alimony *in futuro*. *Isbell v. Isbell*, 816 S.W.2d 735, 739 (Tenn. 1991). But, even if the alimony involved herein could be appropriately classified as *in futuro*, it was not subject to automatic termination upon remarriage of the recipient. At the time the marital dissolution agreement was entered, alimony *in*

---

[4]In *Hussey,* the former wife remarried in 1993, prior to the statute's passage. The court in *Hussey* reasoned that the former wife had a vested right in alimony payments because the parties had intended that the alimony provided for in the agreement would, in effect, be a division of marital property. Accordingly, the court found the alimony agreement to be a vested contractual right which could not be impaired by later statutes.

*futuro* did not automatically terminate at remarriage. *Butcher v. Webb*, 869 S.W.2d 336, 337 (Tenn. 1994).[5]

B. Rehabilitative Alimony Statutorily Subject To Modification

Alternatively, Father argues that the alimony is rehabilitative alimony and subject to modification by the trial court under another statute, Tenn. Code Ann. § 36-5-101(d)(2), which provides:

> An award of rehabilitative, temporary support and maintenance shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances. Rehabilitative support and maintenance shall terminate upon the death of the recipient. Such support and maintenance shall also terminate upon the death of the payor unless otherwise specifically stated. The recipient of the support and maintenance shall have the burden of proving that all reasonable efforts at rehabilitation have been made and have been unsuccessful.

Tenn. Code Ann. § 36-5-101(d)(2).

Father argues that he demonstrated a material change of circumstances justifying termination of the alimony obligation, specifically Mother's remarriage and her successful economic rehabilitation.

The specific statutory provision upon which Father relies was also enacted after the parties' agreement and divorce, and became effective in 1993. 1993 Tenn. Publ. Acts, ch. 243. For the reasons explained in the preceding section, we cannot apply this later legislative enactment to alimony agreed to and awarded earlier if such application would deprive Mother of a vested right. *Waddey*, 6 S.W.3d at 232 n.1 (if statutory amendment constitutes a substantive change in divorce law, the new provision is not applicable to divorces granted prior to its passage). Whether mother had a right to unmodifiable alimony, not subject to decrease or termination due to change in circumstances including successful rehabilitation, depends upon the intent of the parties, including the language of the agreement, and the law at the time of the agreement.

---

[5]Prior to the enactment of Tenn. Code Ann. § 36-5-101(a)(2)(B) the courts applied the so-called "live-in boyfriend" statute, Tenn. Code Ann. § 36-5-101(a)(3), to a remarried alimony obligee who received alimony *in futuro*. *See Isbell*, 816 S.W.2d at 737 (section did not apply because obligee received a fixed amount of alimony). That section creates a rebuttable presumption that the recipient of alimony *in futuro* who lives with a third person is either receiving support from the third person or is contributing to the third person's support, that the recipient no longer needs the previously awarded amount of alimony, and that the court should suspend all or part of the alimony obligation. By its terms, this statute applies only where (1) *in futuro* alimony has been previously awarded, and (2) where modification by the court of the previous award is available. Because we have determined that the alimony award in this case was not "*in futuro*" this provision does not apply. Father has not relied on Tenn. Code Ann. § 36-5-101(a)(2)(B) in any of his arguments.

The parties' marital dissolution agreement stated:

Husband shall pay to Wife rehabilitative alimony in the amount of $5,569.00 per month, payable semi-monthly on the 1st and 15th of each month, for a period of twenty (20) years. Such amount shall not be subject to modification or termination. Wife shall pay income taxes on said payments and Husband shall be entitled to deduct said payments from his income.

The parties used the term "rehabilitative alimony;" however, that term must be interpreted by reference to its meaning in 1992 when the agreement was made.

## C. Rehabilitative Alimony

Since the parties' 1992 divorce, Tennessee alimony law, which is primarily governed by statute, has undergone revision. *See* Tenn. Code Ann. § 36-5-101. Tennessee law, as it exists today, recognizes three distinct types of alimony or spousal support. *Id.*; *Self v. Self*, 861 S.W.2d 360, 361-62 (Tenn. 1993). Alimony may be *in solido, in futuro*, or rehabilitative.

Tennessee law regarding alimony *in solido* has not changed since the entry of the decree herein. Alimony *in solido* promotes the twin goals of certainty and finality though an award of a fixed amount without conditions. *Waddey,* 6 S.W.2d at 232; *Self*, 861 S.W.2d at 362. That fixed amount may be paid in a single lump sum payment, or it may be paid in periodic installments. *Isbell*, 816 S.W.2d at 738 ("[t]he mere fact that the lump sum amount is payable in installments is neither conclusive nor determinative regarding its status as *in solido* or *in futuro*"). The determinative factor in deciding whether an award of spousal support is alimony *in solido*, is the intent of the parties, or the court, that the award be for a fixed amount. *Self*, 861 S.W.2d at 363 (noting that the trial court's award stated the alimony was *in solido* and other provisions supported intent was to provide payments for a definite duration); *Grissom v. Grissom*, 15 S.W.3d 474, 477 (Tenn. Ct. App. 1999) (interpreting the marital dissolution agreement to establish that "the parties did not intend for the payments to terminate unless the wife died"). Alimony *in solido* is not modifiable even upon a showing of changed circumstances, including such events as remarriage or the increased fortunes of the recipient spouse. *Self*, 861 S.W.2d at 362; *Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993); *Grissom*, 15 S.W.3d at 477.

Alimony *in futuro*, sometimes referred to as "permanent alimony" or "periodic alimony," continues support that was incident to the marital relationship and continues indefinitely. It is generally based on the need of the recipient for continued longterm support after the breakup of the marriage. Today, as in 1992, alimony *in futuro* remains subject to the control of the court, and may be modified upon a showing of a significant and material change of circumstances. *Self*, 861 S.W.2d at 361.

Rehabilitative alimony is designed to help a spouse who is economically disadvantaged, relative to the other spouse, to become financially self-sufficient. It is intended to eliminate

dependency of one ex-spouse upon the other and to relieve the parties of "impediments incident to the dissolved marriage." *Id.* Rehabilitative alimony was introduced into our statutes in 1984.

In 1992, the spousal support statute, Tenn. Code Ann. § 36-5-101(d), provided, in pertinent part:

> It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in the subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3).[6]

Our Supreme Court characterized this statute as distinguishing two types of support. "One is temporary and designed to rehabilitate; the other is appropriate for long term support, when rehabilitation is not feasible." *Isbell*, 816 S.W.2d at 736.

At the time the parties herein entered into their agreement, the nature of rehabilitative alimony had been recently discussed by our Supreme Court:

> [T]he advent of rehabilitative support did not totally displace permanent alimony; the courts may still award long-term support and maintenance until remarriage or death of the recipient in situations where rehabilitation is simply not feasible. Where rehabilitative support is awarded, it may be made subject to conditions imposed by the court or agreed to by the parties. But where the rehabilitative award has been made for a fixed amount, the award must be considered non-modifiable, even if it is to be paid in installments and not in a lump sum. The certainty that results from such a rule benefits both parties, allowing each to make long-range financial plans for their own futures and for the future of any children affected by the break-up of the marriage. Unnecessary disruption of financial plans and expectations does not serve the policy fostered by the legislature in its efforts to provide rehabilitation for economically disadvantaged family members faced with marital dissolution. The rule we have recognized today will foster that legislative policy of rehabilitation.

*Isbell*, 816 S.W.2d at 739 (citations omitted).

---

[6]The referenced subdivision (a)(3) created the rebuttable presumption that an alimony *in futuro* recipient who lived with another person no longer needed the amount of support previously awarded. *See supra* note 5.

The primary issue in *Isbell* was whether the statute creating a presumption that the recipient of alimony *in futuro* who lived with a third party no longer needed the amount of alimony awarded was applicable to rehabilitative alimony. The court held that it was not because the statute "by its own terms, applies only to 'alimony *in futuro*'" and not to the temporary, rehabilitative support awarded to Ms. Isbell. *Id.* at 737. Expressly adopting and quoting from the Court of Appeals opinion in *Gerlach v. Gerlach*, C.A. No. 122, 1988 WL 102744 (Tenn. Ct. App. Oct. 6, 1988) (no Tenn. R. App. P. 11 application filed), the Court further held:

> An award of alimony may be *in solido* (a definite amount) or *in futuro* (an indefinite amount over an indefinite period of time). "The determining factor in distinguishing whether alimony is *in futuro* or *in solido* is the definiteness or indefiniteness of the amount ordered to be paid." . . . Although the court did not specify the total amount paid, the full amount of alimony payable - $16,800 - may be definitely determined by simply multiplying the monthly sum ($400) times the designated duration (42 months). . . . The mere fact that the lump sum amount is payable in installments is neither conclusive nor determinative regarding its status as *in solido* or *in futuro*.

*Isbell*, 816 S.W.2d at 738 (citations omitted).

The *Gerlach* court had found Ms. Gerlach's alimony to be *in solido* and not subject to termination upon remarriage. The court also found it significant that the decree awarding alimony had no language providing for termination. *Id.* The *Isbell* court also noted, "If trial courts wish to retain the right to modify an award of rehabilitative support, they should either place certain conditions on the award or not make it for a sum certain over a fixed period of time." *Id.* at 739 n.1.

As *Isbell* makes clear, at the time of the parties' agreement and decree of divorce, rehabilitative alimony established for a definite duration and a definite amount and not specifically subject to conditions was not subject to later modification. *Isbell* also makes clear that a statute applicable to *in futuro* alimony did not apply to rehabilitative alimony.

*Isbell* was followed closely by *Campbell v. Campbell*, 832 S.W.2d 31 (Tenn. Ct. App. 1991), in which this court reluctantly affirmed the termination of "rehabilitative periodic alimony" to a disabled and unemployable wife.[7] In *Campbell*, the wife was awarded "$1,250.00 per month . . . for a period of 36 months, the remarriage or death of the wife, whichever should first occur." 832 S.W.2d at 31. When wife required an extension of her support because she was unable to gain employment or improve her skills due to deteriorating health, the trial court noted that, while the legislature enacted Tenn. Code Ann. § 36-5-101(d) providing for rehabilitative alimony in 1984, it made no provision for subsequent modification of such an award. That court felt "constrained to find that the award originally made became the final judgment as to alimony and is not now subject

---

[7]We note that even the label, "periodic," did not bring the rehabilitative alimony award within the control of the court.

to modification." *Id.* at 32. *Isbell* was released after the trial court's order but before this court rendered its opinion. We stated, "[T]he Rule announced in *Isbell* precludes a trial court from reopening an award of rehabilitative alimony unless the court has expressly retained the right to modify the award." *Id.* We further suggested that the legislature consider amending the statute"by providing that a decree of rehabilitative alimony shall remain in the court's control for the duration of the award, and may be increased, decreased, or otherwise modified upon a showing of a substantial and material change in circumstances." *Id.* at 33.

Shortly thereafter, the legislature did amend the statute to provide for the court's continuing control over awards of rehabilitative alimony. 1993 Tenn. Pub. Acts, ch. 243. The approach to rehabilitative alimony changed with these amendments. As it is presently conceived, rehabilitative alimony is statutory in origin and is clearly distinct from the other two types. Its modifiability has been clearly established. In *Self v. Self* the Supreme Court discussed those 1993 legislative changes even though they were not applicable to the dispute in *Self*, stating, "A third class of spousal support has been created . . . ." 861 S.W.2d at 363. The Court further observed:

> [I]t appears the legislature has specifically given trial courts the authority to order awards designed to accomplish the rehabilitation of a spouse found to be economically disadvantaged but which remain subject to modification by the court upon a showing of "substantial and material change in circumstances." This option obviously sacrifices the certainty incident to an award of "alimony *in solido*" for the continued monitoring of the parties' circumstances by the court . . . .

*Id.*

It is clear from these authorities that prior to the 1993 change rehabilitative alimony was considered different from and alternative to alimony *in futuro*.[8] According to the *Isbell* court, the primary distinguishing factor was whether the alimony was permanent and continuing the support incident to marriage indefinitely, or was set for a definite duration. In *Self*, the court explained that the distinction based on the definiteness of the term "actually reflects the essential purpose of each award." 861 S.W.2d at 362. Thus, the *Self* court found the initial purpose of the award, in view of

---

[8]It is not entirely clear whether, prior to 1993's change making rehabilitative alimony a distinct category of spousal support, the courts considered rehabilitative alimony as a kind of alimony *in solido* or as simply a different name for alimony *in solido*. *Isbell* stated there were two kinds of alimony: (1) temporary, rehabilitative and (2) long term where rehabilitation is not feasible. 816 S.W.2d at 736. However, the court also used the terms *in solido* and *in futuro*. *Id.* at 737. *Self* announced that a "third class of spousal support" was created by 1993 Tenn. Pub. Acts, ch. 243. 861 S.W.2d at 363, confirming there were only two types prior to the amendment. However, the Court found it significant that the trial court had stated that the award was "*in solido*" and further compared *in solido* and *in futuro* alimony, stating the first is rehabilitative support designed to accomplish a stated purpose. *Id.* In *Towner v. Towner*, the Supreme Court determined that in spite of a marital dissolution agreement's characterization of monthly payments as "spousal support/alimony," they were, in fact, part of the distribution of marital property. 858 S.W.2d at 891. The court stated however, that if the payments had not so clearly constituted part of the property distribution, the issue would be whether the "obligation constitutes alimony *in futuro* or *in solido*." *Id.* at 890.

-11-

the circumstances of the parties at the time of the award, was the "critical factor" in determining whether an alimony award was modifiable. *Id.* at 361. In *Towner*, the Court stated that susceptibility to modification is not totally dependent on the duration of the payments, but that consideration of all relevant factors could require or justify definite, nonmodifiable payments on a longterm basis because of the need for certainty and finality. 858 S.W.2d at 890. Most recently, the Supreme Court has returned to defining the distinction between alimony *in futuro* and alimony *in solido* as "determined by either the definiteness or indefiniteness of the sum of alimony ordered to paid at the time of the award." *Waddey*, 6 S.W.3d at 232.[9]

The question of whether the alimony established in the marital dissolution agreement was non-modifiable "can be resolved only by an examination of the language of the provision and the circumstances under which the agreement was executed and made a part of the judgment." *Towner*, 858 S.W.2d at 890. The parties used the term "rehabilitative" to describe the alimony created in their agreement. That choice is indicative of the parties' intent, and the term "rehabilitative" as used in 1992 must be interpreted in light of the existing statute's use of the same term and court interpretations of that statute. Under those authorities, "rehabilitative, temporary" support was distinct from support awarded "on a long-term basis or until the death or remarriage of the recipient."

The use of the term "rehabilitative" also reflects an intent by the parties to enable Mother to become economically self-sufficient relative to Father within a specific time frame. *Self*, 861 S.W.2d at 363. Further, the parties' intent that the alimony not be subject to later modification, by either party, was made explicitly clear. The non-modification provision provided both parties with certainty and finality to allow them to make financial decisions reliably. In addition, the parties chose to place no conditions or contingencies on the receipt of the alimony. *Id.* at 363; *Isbell*, 816 S.W.2d at 739. On the contrary, their agreement specifies that the alimony obligation is to continue for a period of twenty years without modification or termination. Although the total amount of the alimony award is not stated in the agreement, simple arithmetic can determine how much Father agreed to pay when he entered the agreement. Moreover, by the terms of the MDA, "Should there be any obligation, alimony, child support or other, due in the future, after the death of [Father], the children and [Mother] shall have a claim against the estate of [Father] for monies due in the future under this agreement."[10]

---

[9]Father has argued that the alimony payments terminate upon the death of Mother and, therefore, the alimony is in futuro. The MDA is silent about its termination on the death of Mother. Nonetheless, the argument propounded by Father has been specifically disapproved. *Grissom*, 15 S.W.3d at 476 (citing *Self*, 861 S.W.2d at 363 (contingency that alimony would terminate upon wife's death would not defeat the purpose of providing support for a set time)).

[10]In addition, the parties specifically waived any interest each might have in the property or estate of the other, "except as to the obligations imposed by this instrument or by the court's decree, this being intended as a full, final and complete settlement of the property, marital and other rights of the parties." In addition to the non-modification provision specific to alimony, the agreement also provides that no modification or waiver of any of its terms shall be valid unless agreed to in writing by both parties.

In light of all of the above, we find that the "rehabilitative" support provided for in the parties' marital dissolution agreement was non-modifiable. It cannot be subjected to a later statute in such a way as to change Father's obligation or to affect Mother's right to receive the amount of alimony for the duration provided in the parties' agreement.

In addition, it is clear that the agreement was the product of negotiation between the parties. While the language prevents Father from seeking reduction or termination, it also prevents Mother from seeking an increase in amount or duration. Apparently the duration of the alimony payments was set at twenty years in consideration of Mother's relinquishment of any claim to Father's medical practice and related property and to his retirement accounts.[11]

Where the parties see fit to include alimony obligations in their marital dissolution agreement,

> It must be presumed that the alimony provision was part of the inducement or consideration for the other provisions regarding division of the marital estate. The Courts are justified in being reluctant to disturb an alimony obligation assumed under such conditions.

*Campbell v. Campbell*, No. 02A01-9803-CH-00073, 1998 WL 959669 at *5 (Tenn. Ct. App. Nov. 4, 1998) (no Tenn. R. App. 11 application filed) (quoting *Lampley v. Lampley*, No. 01A01-9708-CH-00423, 1998 WL 44938, at *5 (Tenn. Ct. App. Feb. 6, 1998) (perm. app. denied July 27, 1998)).

Similarly, in *Holt v. Holt*, 751 S.W.2d 426 (Tenn. Ct. App. 1988), this court considered a former husband's attempts to be relieved of obligations established in a property settlement agreement which provided for 10 years of payments of alimony *in solido*.[12] In determining that the agreement did not violate public policy, this court also stated:

> Parties should be free to obligate themselves by agreement beyond what the courts could order them to do as a matter of law. In such cases the courts are not sympathetic to a party who promises more than he can reasonably expect to pay in order to induce the other spouse to obtain a divorce and then seeks the termination of the agreed payments.

*Holt*, 751 S.W.2d at 428 (citations omitted).

---

[11] Father's deposition testimony from 1996, which was admitted into evidence, indicates that he was given a draft MDA which provided that he would pay Mother "roughly $4,400" per month for ten years, but that he negotiated to pay the agreed to $5,569 per month for twenty years in order to "keep the retirement account instead of splitting it."

[12] The former husband alleged that the *in solido* alimony provisions were void as against public policy because they were based on future earnings. In addition to holding that no proof existed that the husband's only source of funds to make the payments he agreed to was his future earnings, the court found that the agreement did not otherwise violate public policy.

We affirm the trial court's refusal to modify Father's alimony obligation. *See Hutcherson v. Criner*, 11 S.W.3d 126, 136 (Tenn. Ct. App. 1999) ("This Court will affirm a decree correct in result but rendered upon different . . . grounds.").

## II. Child Support Trust

Father also appeals the trial court's refusal to require a portion of child support to paid into a trust for the benefit of the children.[13] Father argues that some of the child support money should be sequestered from access by Mother because "there is a tremendous amount of money that is flowing in her direction that is being used by her and her current husband."

### A. What Portion is Allocable

We begin our analysis by attempting to define what portion, if any, of the child support Father pays is subject to apportionment to a trust. Any amounts of support that are not legally mandated but are imposed solely by the MDA, are not subject to revision by the court. That includes Father's agreement to pay support and college expenses beyond the date each child reaches the age of majority and graduates from high school. *Sandusky v. Sandusky*, No. M2000-00288-COA-R3-CV 2001 WL 327898, at *4 (Tenn. Ct. App. Apr. 5, 2001) (parent is required to support child until later of eighteenth birthday or the graduation of the class to which child belongs).

While it is generally true that a parent cannot be ordered by the courts to pay child support for an adult child, *Blackburn v. Blackburn*, 526 S.W.2d 463, 465 (Tenn. 1975); *Garey v. Garey*, 482 S.W.2d 133, 135 (Tenn. 1972), a party to a divorce may by agreement obligate himself or herself beyond the support duties imposed by law. Such a provision in an agreement constitutes "a contractual obligation outside the scope of the legal duty of support during minority and retains its contractual nature, although incorporated in a final decree of divorce." *Penland v. Penland,* 521 S.W.2d 222, 224-25 (Tenn. 1975); *Blackburn*, 526 S.W.2d at 465. Any voluntarily assumed obligation exceeding the minimum child support required by statute is based on the parties' contract, enforceable as a contractual obligation, and controlled exclusively by the agreement. *Haas v. Haas*, No. 02A01-9604-CV-00073, 1997 WL 194852, at *3 (Tenn. Ct. App. Apr. 22, 1997) (no Tenn. R. App. R.11 application filed). A parent's agreements to pay college expenses as well as to provide support beyond majority are contractual obligations for which the parent has no legal duty and which are not subject to modification by the courts. *Penland*, 521 S.W.2d at 224-25; *Dorris v. Dorris*, No. 01A01-9304-CV-00170, 1993 WL 380778, at *2 (Tenn. Ct. App. Sept. 29, 1993) (no Tenn. R. App.

---

[13]Although Father testified at the March 1998 hearing regarding his desire that a trust be established for future support payments, he also raised the issue of placing the arrearages awarded Mother after the trial in trust. We note that this court has addressed child support arrearages, stating: "The award for back support is intended either to benefit the parties' child or to reimburse [the mother] for contributing more than her fair share to her son's support. In the absence of proof to the contrary, the award of back child support should be made to [the mother] . . . ." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 250 (Tenn. Ct. App. 2000).

P. 11 application filed) (the trial court has no statutory power to award child support beyond the age of majority and no continuing power to modify such support).

In this case, Father's agreements to provide support until each child reaches twenty-two and to also pay for college expenses remain enforceable as contractual provisions, and are not modifiable by the courts as child support obligations imposed by law. That limitation applies not only to the amount agreed to be paid, but also to the arrangement established in the contract. "The courts may not make a new contract for parties who have spoken for themselves and may not relieve parties of the contractual obligations simply because these obligations later prove to be burdensome or unwise." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999) (citations omitted). Therefore, Father's request to modify the amount of child support going directly to Mother can only relate to the child support due for each child until he or she reaches the age of eighteen and graduates from high school.

### B. The Child Support Guidelines' Definition of Amount Allocable to Trust

The parties modified their original MDA in 1996, and the trial court entered a consent order to reflect those modifications. Essentially, Father agreed to pay an additional $300 per week in child support in exchange for release from certain other obligations. That modification resulted in Father's support obligation for three children being set at $2,050 per week, which converts to a monthly obligation of $8,883.33. Using the formula set out in the guidelines, that amount would be appropriate for three children of a parent whose monthly net income, calculated according to the guidelines, was $21,665. Father sets his net income for 1997 at $334,912, which converts to monthly net income of $27,909. He acknowledges that his monthly support obligation for three children, if the guidelines' percentage were strictly applied to his total net income without deviation, would be $11,442.75 per month.[14]

Father asserts that the amount of support he pays over the amount due under the guidelines on net income over $10,000 per month is subject to being placed in trust, relying upon a provision of the guidelines relating to high income obligor parents, which, after an amendment effective October 5, 1997, provides:

> The court must consider all net income of the obligor as defined according to 1240-2-4-.03 of this rule. The court must order child support based upon the appropriate percentage to the custodial parent up to a net $10,000 per month of the obligor's income. When the net income of the obligor exceeds $10,000 per month, the court

---

[14]In its May 28, 1998, order, the trial court recounts that Father's support obligation was reduced when his daughter moved in with him "to the equivalency of thirty-two (32%) percent of his 'net income,' being One Thousand Six Hundred Dollars ($1,600.00) per week." Thus, the trial court found that the parties used a net income figure of $5,000 per week, or $260,000 per year. The court also specifically found, when reinstating the child support at $2,050 per week, that the parties agreed this amount was substantially less than it would be if the guidelines were strictly applied to the current income and visitation practices of Father. The amount of direct cash payment for support does not include the other expenses Father pays, such as the medical, educational and automobile expenses in dispute.

may consider a downward deviation from the guidelines if the obligor demonstrates that the percentage applied to the excess of the net income above $10,000 a month exceeds a reasonable amount of child support based upon the best interest of the child and the circumstances of the parties. The court may require that sums paid above the percentage applied to the net income above $10,000 be placed in an educational or other trust fund for the benefit of the child.

Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(3).

Thus, under the 1997 version, the court may make a downward deviation in the amount of support after "considering" all net income, but not below the amount based on $10,000 monthly net income, if the obligor demonstrates that support based on the total amount "exceeds a reasonable amount of child support based upon the best interest of the child and the circumstances of the parties."[15] Father does not argue, however, that his total child support amount should be reduced; instead he argues that some portion of it should be placed into trust. Assuming that the amount of Father's current child support obligation is the product of application of Tenn. Comp. R. & Regs, ch. 1240-2-4-.04(3),[16] the amount subject to allocation to a trust fund is that portion of the support which is greater than the amount Father would be required to pay based on a net income of $10,000 per month, $4100 per month.

### C. Trust is Discretionary

Having determined that the trial court has authority to require that some portion of Father's support payments be placed in an educational or other trust fund for the benefit of the children, we

---

[15]The amount of support is the product of applying the guidelines' percentages, based on the number of children, to the obligor's net income, as defined in the guidelines. "After this calculation is made, if there are no changes to be made pursuant to paragraph 1240-2-4-.04 below, then this is the amount of the child support award." Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(5). The "Criteria for Deviation From Guidelines" section provides that the percentage amounts are minimums and, therefore, the court "shall increase" the award for specified reasons. Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(1). The section also allows deviation in other cases, "when the court finds it is in the best interest of the children," such as where the obligor parent exercises more than standard visitation. Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(2). As explained above, specific authorization is given for downward deviation for income over $10,000 per month and in instances of extreme economic hardship in order to achieve equity between the parties. Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(3) and (4). Finally, "In deviating from the guidelines, primary consideration must be given to the best interest of the child(ren) for whose support the guidelines are being utilized." Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(5). Tenn. Code Ann. § 36-5-101(e)(1) allows deviation from the guidelines "in order to provide for the best interest of the child(ren) or the equity between the parties." *See also Barnett v. Barnett*, 27 S.W.3d 904, 909 (Tenn. 2000) (other factors, such as the custodial parent's income, may be considered in making a downward deviation in some situations).

[16]In the June 4, 1996, consent order the court made a finding that the proposed modifications were consistent with Tennessee law and in the best interest of the parties and their children. The court was aware that the amount agreed to was the amount that would be due from strict application of the percentages to a total net income of $260,000 per year, *see supra* note 14, aware that Father's total net income exceeded that amount, and was aware of the other amounts Father had undertaken to pay.

now review the trial court's decision not to exercise that authority. The relevant sentence of the guidelines states that "the court may require" payments into a trust. This language does not differ substantively from the pre-1994 version's "these cases may require" or the 1994 amendment's "the court may establish" and gives wide latitude to the trial in making that decision. The establishment of a trust for educational or other purposes for the benefit of a child is a discretionary mechanism or alternative arrangement that is available to the trial court in fashioning a support award for the benefit of the child. *Nash v. Mulle*, 846 S.W.2d 803, 806 (Tenn. 1993); *Anderton v. Anderton*, 988 S.W.2d 675, 681 (Tenn. Ct. App. 1998); *Smith v. Smith*, No. 01A01-9809-CH-00515, 1999 WL 548568, at *4 (Tenn. Ct. App. July 29, 1999) (no Tenn. R. App. P. 11 application filed).

The fact that a decision is discretionary necessarily implies that the trial court has a choice of alternatives among a range of acceptable ones; our role is to determine whether the trial court's decision is within that range, based upon applicable legal principles and the evidence. Regarding the issue before us, the applicable legal principles are found in the guidelines, the goals of child support, and the goals behind establishing such a trust.

In *Nash v. Mulle*, the Supreme Court considered the use of an educational trust fund as a component of child support for a high income obligor parent. The court found that such a trust was one mechanism available to further the goals of the guidelines and other specific goals such as protection for the child from an uncaring non-custodial parent, preserving for the child the opportunity to pursue higher education since the obligor parent is not otherwise required to fund that pursuit, and minimizing an unintended windfall to the custodial parent. 846 S.W.2d at 807-09.

Neither of the first two of the listed goals is applicable in this case. At the hearing Father testified that he wanted half his support payments placed in trust for private school, college, automobiles, "anything that's not needed for day to day needs," and that if the trust could not fund college or other expenses fully he would pay the difference. However, Father is already contractually obligated to provide those expenses, including support and college expenses after the children reach eighteen if they are enrolled in college. Thus, although Father maintained he was not seeking a reduction in the amount of support he was providing, he was in fact asking that a portion of that support be set aside to defray expenses he was otherwise obligated to pay. We are not convinced there is a real difference.

On appeal, Father focuses his argument on the avoidance of a financial windfall to Mother. He argues that the entire amount of support he provides is not needed for support of the children and that Mother and her new husband may get the benefit of any amount above that necessary. Father asserts that Mother was unable to provide real documentation for monthly expenses exceeding $4,000.[17] Mother, however, submitted an itemized expense form claiming monthly expenses of over

---

[17]Mother's counsel maintains that Mother was not asked to bring such documentary evidence. We note that Father's testimony on his own expenses did not include receipts or other documentation, and that he was unfamiliar with the details of the expense statement.

$14,000 and allocated $9,300 of that to the children.[18]  Father insists that with these claimed, but undocumented, expenditures and Mother's remarriage "to an individual with a modest income," the court should ensure "that the funds being paid as child support only benefit the children, rather than being used to enhance Mrs. Bryan's enormous stock portfolios, or to be used for some purchase of an asset to be shared with Mr. Bryan."  He concludes that half the support he pays will more than adequately meet the needs of his three children.

In *Nash v. Mulle*, the Supreme Court discussed the analysis a trial court should use in determining how to set the child support obligation of a parent whose monthly net income exceeds $6,250 (now $10,000) per month.  The court noted that one of the major goals expressed in the guidelines is "to ensure that when parents live separately, the economic impact on the child(ren) is minimized and to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard."  846 S.W.2d at 804-05.  The court further stated:

> It reminds us that Tennessee does not define a child's need literally, but rather requires an award to reflect both parents' financial circumstances.  This goal is consistent with our long established common law rule, which requires that a parent must provide support "in a manner commensurate with his means and station in life."
>
> . . .
>
> Long-standing Tennessee law requires the courts to evaluate children's needs not in terms of life's essentials, but in terms of the parents' "means and station in life."

*Id.* at 805, 808 (citations omitted).

The court also noted that it would be unfair to require a custodial parent to prove a specific need before the court would set support at an amount above that due on $10,000 (then $6,250) monthly net income, and stated: "At such high income levels, parents are unlikely to be able to "itemize" the cost of living." *Id.* at 806.

Father's attempts to establish that any amount above $4,000 per month is unreasonable suffer from his testimony regarding his own expenditures on his current household which includes his new wife and her two daughters.  Those children are given their own father's child support of $700 per month as spending money.  Father and his new family spend approximately $24,000 per month, and he testified that he thinks spending $22,000 to $24,000 per month to support four people is reasonable.[19]

In its October 1998 order, the trial court stated:

---

[18]Mother did not include any income or expenditures for Mr. Bryan on her statement, but testified that his income and expenditures were about equal.

[19]Mother's expenses did not include a house payment, because she had paid the balance of her mortgage. Father's mortgage payment was $2,500 per month.

The Defendant argues that a portion of the amount of child support should be placed in a trust fund for the children. The Guidelines were amended in December of 1994 to allow the Court discretion to place certain amounts into a trust fund for the children. However, some eighteen months after the Guidelines were amended, the Defendant felt the amounts of child support were reasonable and needed by the Plaintiff and should not be placed in trust.

The court was referring to the June 4, 1996, consent order wherein the parties agreed to modify their marital dissolution agreement as part of a compromise and settlement of various disputes. At trial, Father testified that he thought the amount he agreed to, $2,050 per week, was reasonable and fair at the time he made the agreement.

We find that the trial court acted well within its discretion in denying Father's request that some of his support payments be placed in a trust.

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, __ S.W.3d __, No. E1999-02583-SC-R11-CV, 2001 WL 455876, at *2 (Tenn. May 2, 2001).

The trial court's decision was based on the correct legal standard and was supported by evidence. We affirm the refusal to order a trust for a portion of the child support.

## III. Contempt

The trial court's order of May 28, 1998 found Father to be in contempt for his failure to pay or reimburse Mother for medical and educational expenses of $5,581.92 as previously ordered.[20] The court declined to find Father in contempt regarding the child support Father had failed to pay after the older daughter, Clara, had returned to her mother's home in 1997. The trial court stated that had Mother filed an appropriate petition in 1997, the court could have restored the amount of the support obligation. The court was later apprised of the fact that Mother had filed such a petition in March 1997, and Mother filed a motion to alter or amend, attaching an agreement by the parties

---

[20]The court gave Father thirty days from the date of the order to make the payment, and stated, ""[I]f at the end of thirty (30) days from the date of the filing of this Order, [Father] has not paid said judgment, [Mother] will be entitled to statutory interest on the unpaid balance until paid in full."

that the child support amount awarded after hearing would be retroactive to February 23, 1997. An order was entered July 27, 1998 awarding Mother $46,200 for arrearages on the child support based on the older daughter's return to Mother's home and custody.[21]

Following those orders, Father did not make the payments as ordered; instead he sought a stay pending appeal. Nor did he pay other expenses which arose following the orders. Mother filed another petition for contempt, which she amended to include later arising expenses, seeking an additional $6,516.71.[22] The hearing was held on August 28, 1998. The court heard arguments of counsel, but did not take testimony. Father's counsel attempted to reargue Mother's lack of "need" for the child support, and stated that "disagreement" existed between the parties regarding the amounts owed. Mother's counsel submitted an exhibit which itemized the expenses Father had failed to pay. Mother's counsel alleged, and the trial court found, that Father owed her the following payments pursuant to the MDA: Clara's auto expenses, $1,116.25; school expenses for Mary and David, $4,727.25; medical expenses for children, $403.21;and life insurance on Mother, $270.00, for a total of $6,516.71

Following the arguments, the court issued an order finding Father to be in "willful contempt of the Orders of this Court for his failure to pay these items." The court then declined Father's motion to stay its May order regarding similar expenses and his motion to place the $46,200 child support arrearages into a trust account. Mother was awarded a judgment against Father for the $6,516.71.[23] The court then ordered, "For each and every day that [Father] fails to pay this Judgment, and the amount of the previous Judgments entered in this cause, [Father] shall be fined the sum of One Hundred ($100.00) Dollars per day until the amounts are paid in full." The court ordered Father to pay the deficiency of child support to Mother "immediately, the failure [of] which shall likewise be covered by the fine as set forth above." The court stated, "The Court will not continue to allow [Father] to disregard agreements previously made by him and the Orders of this Court, and any future failure of [Father] to comply with the Orders of this Court will be dealt with harshly."

---

[21]Clara had moved to her Father's residence, and Father and Mother had agreed to a reduction in support from him and an amount of support from her, with a net decrease in his weekly obligation of $700. When Clara moved back to Mother's house shortly thereafter, on February 23, 1997, Father did not pay the amount due before the modification. Mother filed her petition to reinstate the former amount of child support on March 7, 1997, but the trial court's initial order indicated the court was unaware of that fact. The July order corrected that oversight and, pursuant to agreement, stated that the increase in child support "shall be effective as of, and be paid retroactively to, February 23, 1997, the date Clara Leach moved to [Mother's] residence." Father has not appealed the amount of arrearages.

[22]The MDA designated these items and expenses as "additional child support."

[23]The court entered an additional judgment for $2,500 for Mother's attorney fees.

-20-

On appeal, Father raises several "concerns" about the authority of the court to impose the contempt sanctions.[24]

## A. Conduct Subject to Contempt

Our Supreme Court has determined that the courts of this state do not have unlimited powers of contempt, holding that those inherent powers have been limited by statute:

> [T]he inherent power of courts to punish contemptuous conduct has long been regarded as essential to the protection and existence of the courts. Indeed, at common law, the power of courts to punish contempts was vast and undefined. Because unlimited, undefined discretionary power carried with it the potential for abuse, specific statutory provisions were adopted to limit and define the conduct punishable by contempt. . . . Conduct punishable as contempt in Tennessee now is delineated in Tenn. Code Ann. § 29-9-102 . . . .

*Black v. Blount*, 938 S.W.2d 394, 397 (Tenn. 1996) (citations omitted).

> The statute which delineates the conduct punishable by contempt provides:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases: . . .

> (3) The willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of said courts . . . .

Tenn. Code Ann. § 29-9-102.

While Father challenges the court's authority in several specifics, none really disputes the finding that he was in willful disobedience of the court's prior orders. Much of Father's argument

---

[24]We address some of those concerns in the opinion. Others can be disposed of more briefly. For example, Father contends that the court's earlier ruling, which found him in contempt but declined to impose a penalty, is *res judicata* on those issues. This contention ignores the facts that the August hearing dealt with monies due after the May hearing and therefore were not previously adjudicated, that he had previously been found "in contempt," and that he still had not paid the monies he had been ordered to pay. Another concern is that he cannot be held in contempt for failure to pay the alimony which "clearly terminated" on Mother's remarriage. Although past due alimony does not appear to have been an issue before the court in August, as we have discussed above, the alimony did not terminate. In any event, Father has provided no showing that he raised any of these concerns in the trial court, thus, we consider them waived. *Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000).

rests upon his characterization of the type of contempt involved herein as criminal. Father is mistaken in that regard. As the Supreme Court has explained:

> Contempts may be either criminal or civil in nature. Civil contempt occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights. If imprisonment is ordered in a civil contempt case, it is remedial and coercive in character, designed to compel the contemnor to comply with the court's order. Compliance will result in immediate release from prison. Therefore, it has often been said that in a civil contempt case, the contemnor "carries the keys to his prison in his own pocket. . . ."
>
> Criminal contempts, on the other hand, are intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society. Therefore, sanctions for criminal contempt are generally both punitive and unconditional in nature. While criminal contempts may arise in the course of private civil litigation, such proceedings, "in a very true sense raise an issue between the public and the accused." In the trial of a criminal contempt case, therefore, guilt of the accused must be established by proof beyond a reasonable doubt.

*Black*, 938 S.W.2d at 398 (citations omitted).

Traditionally, contempt has been classified as civil or criminal depending upon the action taken by the court to address the contempt. *Ahern v. Ahern*, 15 S.W.3d 73, 78 (Tenn. 2000). "A civil contempt is one where a person refuses or fails to comply with an order of the court and punishment is meted out for the benefit of a party litigant." *Givler v. Givler*, 964 S.W.2d 902, 909 (Tenn. Ct. App. 1997) (quoting *Garrett v. Forest Lawn Mem'l Gardens, Inc.*, 588 S.W.2d 309, 315 (Tenn. Ct. App. 1979)). Because the court's order fining Father $100 per day was designed to coerce Father to pay the amounts ordered, and because Father could avoid the fine and purge his contempt by obeying the court's orders, the finding of contempt was clearly civil contempt.[25]

> After a finding of contempt, courts have several remedies available depending upon the facts of the case. A court can imprison an individual to compel performance of a court order. This is typically referred to as "civil contempt." This remedy is available only when the individual has the ability to comply with the order at the time of the contempt hearing. Thus, with civil contempt, the one in contempt has the "keys to the jail" and can purge the contempt by complying with the court's order. In civil contempt, the imprisonment is meted out for the benefit of the party litigant.

---

[25]We also note that Mother's petitions for contempt requested relief that was civil in nature, and did not comply with the notice requirements for criminal contempt. The procedural safeguards required for a finding of criminal contempt were not requested by Father and were not observed. Thus, there is no indication that the parties or the court considered these proceedings to involve potential punishment for criminal contempt.

*Ahern*, 15 S.W.3d at 79.

Father has consistently maintained, and continues to maintain, that he is financially capable of paying the amounts agreed to by him and ordered by the court. Thus, he had the ability to comply with the order at the time of the contempt hearing, and the court was justified in finding him in civil contempt.

Father also contends that contempt is not available to enforce certain of the obligations he says are included in the amounts he failed to pay. Primary among those are obligations he asserts relate to support for the oldest child after her eighteenth birthday. For this proposition, father relies upon *Penland v. Penland*, 521 S.W.2d 222 (Tenn. 1975). In that case, the Supreme Court held that the father's agreement to provide support or specified expenses beyond the children's majority retained its contractual nature. Consequently, "Mrs. Penland or the daughters are entitled to enforce said obligation by the obtaining of a money judgment, from time to time, as the obligation matures, and for the enforcement thereof by execution, as provided by law." *Penland*, 521 S.W.2d at 225; *see also Jones v. Jones*, 503 S.W.2d 924, 929 (Tenn. Ct. App. 1973) (the mother's attempt to enforce the father's promise to support their daughter until she finished college or reached age 22 by seeking a judgment, not by attachment for contempt, indicated she was attempting to enforce a contractual obligation).

However, Father fails to specify what amount of the total he was ordered to pay is attributable to his contractual obligation to support his children beyond the time he is legally obligated to provide such support. He merely states his older daughter's date of birth as November 12, 1980, but claims "some of the expenses charged will apply toward benefits which post-date her eighteenth birthday." Father was found to be in contempt for failure to pay obligations as of March, 1998, and August, 1998. Therefore, we fail to understand his reference to obligations beyond his daughter's majority. Further, the legislature has clearly addressed arrearages for amounts due during the child's minority but remaining unpaid at that time:

> Absent a court order to the contrary, if an arrearage for child support or fees due as court costs exist at the time an order for child support would otherwise terminate, the order of support . . . and all amounts ordered for payment of current support or arrears . . . shall continue in effect . . . until the arrearage and costs due are satisfied and the court **may enforce all orders for such arrearages by contempt.**

Tenn. Code Ann. § 36-5-101(k) (emphasis added). Therefore, we find no merit in Father's complaint regarding his obligations beyond his children's majority.

## B. Punishment for Contempt

Father argues on appeal that the trial court acted beyond its authority by imposing the $100 per day penalty. He contends that criminal contempt sanctions are legally limited to a specific period of incarceration and a $50 fine and that there is no authority for imposition of a $100 per day

penalty, whether it be for criminal or civil contempt. As noted above, our Supreme Court has held that courts' inherent power to punish by contempt has been limited by statutes defining the conduct which is subject to such punishment. *Black*, 938 S.W.2d at 397. In *Kuykendall v. Wheeler*, the Supreme Court stated that the trial court's inherent power to enforce its orders remained intact, citing Tenn. Code Ann. §21-1-804.[26] 890 S.W.2d at 787. In addition, however, the Court held that "in exercising this power, the trial court, as always, must use only those means which have been granted by the legislature or common law tradition." *Id.*

We have determined that the trial court acted within its discretion under applicable legal principles and the evidence in finding Father in contempt for willful disobedience to the court's orders. Our statutes address the means available to a court in such circumstances:

> (a) If the contempt consists in an omission to perform an act which it is yet in the power of the person to perform, the person may be imprisoned until such person performs it.
>
> (b) The person or if same be a corporation, then such person or corporation can be separately fined, as authorized by law, for each day it is in contempt until it performs the act ordered by the court.

Tenn Code Ann. § 29-9-104.

These provisions make it clear that the trial court could have ordered Father imprisoned until he paid the amounts ordered. It is also clear that the statute authorized a fine against Father for every day he was in contempt until he complied with the court's order. The amount of the daily fine is the question.

The statute directs that Father may be "fined, *as authorized by law*, for each day [he] is in contempt until [he] performs the act ordered by the court." Tenn. Code Ann. § 29-9-104(b) (emphasis added). The holding in *Kuykendall* suggests that such authority may be found in statute or in common law. One statutory source for fines for contempt is Tenn. Code Ann. § 29-9-103, which provides, "[t]he punishment for contempt may be by fine or by imprisonment, or both. Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days . . . ."

The relationship between this statute and Tenn. Code Ann. § 29-9-104 has been described as "not mutually exclusive:" one sets out the punishment for criminal contumacy in resisting the established authority of the court, while the other confers upon the courts the essential powers of coercion to enable them to enforce their judgments and decrees. *Black v. Black*, 50 Tenn. App. 455,

---

[26]That statute provides, "Courts of chancery may enforce rules, orders, or decrees by process against the person in default or by process against the person in default's property."

458, 362 S.W.2d 472, 474 (1962). Both statutes allow courts to impose fines and to imprison, but for different purposes. The ten-day limitation on imprisonment for criminal contempt does not apply to coercive imprisonment for civil contempt, by the express terms of the civil contempt statute. However, no such specific exemption from the $50 limit on fines is present in the statute.

Although a number of specific statutory provisions exist regarding enforcement of child and spousal support awards, we have found none that provide specific authority for coercive civil contempt fines above $50. *See* Tenn. Code Ann. §36-5-101(a)(2)(A) (such awards "may be enforced by any appropriate process of the court having jurisdiction thereof"); Tenn. Code Ann. § 36-5-101(a)(5) (unpaid amounts become arrearages on date due and accrue interest); Tenn. Code Ann. § 36-5- 101(b) (attachment and appearance bond for delinquent obligor and security bond); Tenn. Code Ann. § 36-5-103 (court may require bond to secure payment, may sequester certain property, appoint a receiver over assets and income, place a lien on property of obligor); Tenn. Code Ann. § 36-5-901 *et seq.* (enforcement of overdue support by department of human services; liens). In addition to the general contempt statute, the General Assembly has provided a specific statute, Tenn. Code Ann § 36-5-104, to address obligors who fail to pay ordered child support. That statute creates a separate criminal offense punishable by up to six months' imprisonment. *Brown v. Latham*, 914 S.W.2d 887, 888 (Tenn. 1996). It does not affect the sanctions available for contempt.

Civil contempt sanctions are imposed for the benefit of a party litigant. *Ahern,* 15 S.W.3d at 79*; Garrett*, 588 S.W.2d at 315. The purpose of such sanctions is to coerce compliance with a prior court order; the party seeking sanctions benefits from that compliance.[27] In Tennessee, coercive civil contempt has generally involved imprisonment until the contemnor complies with the court's order, thus the often-made reference to "keys to the jail." In fact, we have been unable to find any prior authority in Tennessee regarding coercive fines imposed in civil contempt.

---

[27]While federal courts sometimes distinguish between compensatory and coercive civil contempt, *see, e.g., Glover v. Johnson*, 199 F.3d 310, 313 (6th Cir. 1999), we are unaware of the adoption of the concept of compensatory civil contempt in Tennessee courts. *See Young v. Young*, No. 01A01-9609-CV-00415, 1997 WL 107159, at *3n. 2 (Tenn. Ct. App. Mar. 12, 1997) (no Tenn. R. App. P. 11 application filed) ("We know of no Tennessee cases recognizing compensatory civil contempt . . ."). In the federal courts:

> Civil contempt sanctions may be imposed for either or both of two distinct purposes, to coerce compliance with a court order, and to compensate the complainant for actual losses sustained by him as the result of the defendant's contumacy. If the fine is compensatory, it is payable to the complainant and must be based on proof of the complainant's actual loss. If the fine is coercive it is paid into the court registry, not to the complainant.

*In re Chase & Sanborn*, 872 F.2d 397, 400-01 (11th Cir. 1989).

Tennessee appears to have incorporated the concept of damages arising from contempt in Tenn. Code Ann. § 29-9-105, which makes damages available where the contempt consists of the performance of a forbidden act. Because Father's contempt herein consisted of failure to pay support as ordered, Mother will be compensated for his delay by the interest accumulated on the arrearage. *See* Tenn. Code Ann. § 36-5-101(a)(5).

-25-

Therefore, having found no independent authority for a greater fine, we interpret the phrase, "as authorized by law," to refer to the prior section, Tenn. Code Ann. § 29-9-103(b), which authorizes a fine of up to $50 for contempt of court. Thus, Father could have been imprisoned indefinitely, or fined $50 per day, until he paid the amounts ordered. The penalty for noncompliance with the court order is modified to order a $50 fine per day.[28]

IV.

In conclusion, we affirm the trial court's refusal to modify the alimony award because the court had no authority to do so. We also affirm the court's refusal to place some of the child support in a trust fund because the court did not abuse its discretion. We affirm the finding of contempt, but reduce the coercive fine for civil contempt to $50 for each day Father fails to comply with the court's order. This cause is remanded to the trial court for such further proceedings as may be necessary. Costs are taxed to James Wendell Leach for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[28]Mother states in her brief that the trial court's order directed that payments of the fine be made to her. We have studied the order and have found no such directive. The order is silent as to the recipient of the funds, and we find no Tennessee authority which would direct such "fines" to the mother in the absence of an order. As noted above, in federal courts, coercive civil contempt sanctions, such as the one before us, are typically paid to the court. *See In re Chase & Sanborn*, 872 F.2d at 401.