# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### NOVEMBER 17, 2010 Session

## ELIZABETH ANN GRISHAM v. MARK ALAN GRISHAM

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000030-04      Lori Ridder, Judge**

---

**No. W2010-00618-COA-R3-CV - Filed February 22, 2011**

---

Citing decreased income, Husband filed a petition to modify alimony and child support, and Wife filed a contempt petition against Husband. The trial court reduced both Husband's alimony and child support obligations, it refused to hold Husband in contempt, and it declined to award Wife her attorney fees and court costs. We reverse the trial court's modification of Husband's alimony obligation and we reinstate the provisions of the Consent Order with regard to alimony; we affirm the trial court's finding of a significant variance, but we remand for a modification of Husband's child support obligation consistent with this opinion; we affirm the trial court's finding regarding contempt; we award Wife her reasonable attorney fees and court costs expended in defending Husband's petition to modify and in filing her petition for contempt, and we remand for a determination of such fees; and finally, we decline to award attorney fees on appeal.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part, and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Leslie Gattas Coleman, Jason R. Ridenour, Memphis, Tennessee, for the appellant, Elizabeth Ann Grisham

Lara E. Butler, Memphis, Tennessee, for the appellee, Mark Alan Grisham

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Mark Alan Grisham ("Husband") and Elizabeth Ann Grisham ("Wife") were divorced in 2006 after twenty-four years of marriage. At the time of the parties' divorce, the trial court entered a "Permanent Parenting Plan Order" ("Parenting Plan") naming Wife primary residential parent of the parties' minor child, and setting Husband's child support obligation at $4,000.00 per month, including a $1,900.00 upward deviation. The parties also entered a "Marital Dissolution Agreement," ("MDA") in which Husband agreed to pay Wife rehabilitative alimony of $11,500.00 per month for ninety-six months.

However, on May 15, 2008, Husband filed a "Petition to Modify Final Decree of Divorce," claiming an "unanticipated substantial and material change of circumstances" had occurred in that "[t]he largest customer of [Husband's] employer[, Lucite,] sold its Olive Branch plant. This was [Husband's] biggest customer, and the loss of this plant has caused a significant reduction in his income."[1] Wife then filed a "Petition for Scire Facias and Citation for Civil and Criminal Contempt," claiming that Husband had failed to fulfill his alimony and child support obligations during the months of April and May 2008.

The trial court entered a "Consent Order Modifying Alimony and Child Support and Awarding Judgment for Arrearage" ("Consent Order") on May 11, 2009. The Consent Order reduced Husband's child support obligation from $4,000.00 per month to $3,000.00 per month, including a $900.00 upward deviation "based on the child's standard of living and the child's expenses." It also modified his alimony obligation from $11,500.00 per month "to a percentage of his gross income from all sources whatsoever, specifically a sum equal to one-third of his gross monthly income minus $3,000."[2] The Consent Order provided the following example for calculating Husband's monthly alimony obligation:

> Therefore, by way of example if [Husband] has a gross monthly income of $30,000 for June 2009, then his alimony obligation for June 2009 shall be $7,000. By way of further example if [Husband's] gross monthly income for June 2009 is $120,000, then his alimony obligation for June 2009 shall be

---

[1]Husband is employed by H & S Forest Products as a regional sales manager. He buys pallets from mills, marks up the price, and sells the pallets to his customers.

[2]The subtraction of $3,000.00 was apparently based on Husband's child support obligation, as the Consent Order provides that "Upon the termination of Father's child support obligation his alimony obligation shall be calculated in the same manner by deducting $3,000 notwithstanding the fact that he has not paid the sum of $3,000 as child support."

$37,000. By way of further example if [Husband's] gross monthly income for June 2009 is $5,000, then his alimony obligation for June 2009 shall be zero although he will have paid $3,000 in child support for such month.

All other provisions of the Parenting Plan and MDA were to remain in full force and effect, and Wife's petition for contempt was dismissed.

On August 4, 2009, Husband filed a second "Petition to Modify Final Decree of Divorce," seeking further reductions of his child support and alimony obligations. Husband described the "unanticipated substantial and material change of circumstances" warranting the reductions as follows:

Specifically, in June 2009, one of Husband's largest customers obtained competitive bids from others which required Husband's employer to respond with lower prices to retain the business. In July, 2009, the customer obtained additional competition bids which required Husband's employer to reduce the prices even lower. During the first 6 months of 2009, Husband's gross profit on this customer's sales was 23.56%, while his average of all other customers was 11.35%. Also, for the first 6 months of 2009, this customer's gross profit was 35.57% of the total gross profit on all of Husband's accounts. Based on these figures, this will result in a 25% drop in Husband's monthly income[.]

Wife, again, filed a "Petition for Scire Facias and Citation for Civil Contempt," claiming that Husband had not fulfilled his alimony obligation for the months of May and June 2009, as calculated pursuant to the Consent Order.

Following a hearing, the trial court, on February 9, 2010, entered an "Order on Petition to Modify Final Decree of Divorce and Petition for Scire Facias and Citation for Civil Contempt." The court found Husband's income was "steadily declining" and "established" his current income at $12,000.00 per month. It found a significant variance between the proposed presumptive support order based on this income and the current support order, excluding the upward deviation, and therefore, it reduced Husband's child support obligation to $1,513.00 per month. Regarding alimony, the trial court found that when the Consent Order was entered, Husband "did not know the full impact of losing Lucite as a customer on his commissions[.]" Therefore, because Husband was "no longer earning what was contemplated by the parties either in 2006, or in May 2009[,]" when the Consent Order was entered, the trial court found a substantial and material change in circumstances had occurred, and that such change warranted a reduction of Husband's alimony obligation to $2,000.00 per month. Finally, the trial court refused to hold Husband in contempt, because "[w]hile the court believe[d] that [Husband] could have paid his alimony . . . , it may have

necessitated that he borrow additional funds to do so." Wife appeals.

## II. ISSUES PRESENTED

On appeal, Wife presents the following issues for our review, summarized as follows:

1.      Whether the trial court erred in finding a substantial and material change in circumstances existed to warrant a modification of alimony;

2.      Whether the trial court erred in finding a significant variance to warrant a modification of child support;

3.      Whether the trial court erred in eliminating the upward deviation in child support;

4.      Whether the trial court erred in failing to find Husband in contempt of the Consent Order;

5.      Whether the trial court erred in failing to award Wife her attorney fees for seeking enforcement of the trial court's order; and

6.      Whether Wife is entitled to attorney fees and costs on appeal.

For the following reasons, we reverse the trial court's modification of Husband's alimony obligation and we reinstate the provisions of the Consent Order with regard to alimony; we affirm the trial court's finding of a significant variance, but we remand for a modification of Husband's child support obligation consistent with this opinion; we affirm the trial court's finding regarding contempt; we award Wife her reasonable attorney fees and court costs expended in defending Husband's petition to modify and in filing her petition for contempt, and we remand for a determination of such fees; and finally, we decline to award attorney fees on appeal.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2009)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000);

*The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond,* 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Modification of Alimony

On appeal, Wife argues that the trial court erred in modifying Husband's alimony obligation. She claims that because the parties' Consent Order addressed the change in circumstances asserted by Husband–his reduced income–the court was required to defer to the terms of the agreement, unless doing so would lead to an unconscionable result.

As support for this argument, Wife cites *Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001), in which our Supreme Court considered the effect of a marital dissolution agreement upon a husband's ability to modify his spousal support payments. Pursuant to the *Bogan* MDA, husband agreed to make monthly support payments to wife until her death or remarriage. *Id.* at 725. Although the MDA provided for an equal division of the value of Husband's retirement plan as of the date of its execution, it did not address the effect of husband's retirement upon his spousal support obligation. *Id.* at 725, n.1.

When husband petitioned to modify his spousal support obligation based upon his upcoming retirement, wife answered that his retirement was both foreseeable when the MDA was entered as well as voluntary, such that no material change in circumstances had occurred. *Id.* at 725. The trial court found husband's retirement constituted a material change in circumstances, and that a reduction in his support payments was warranted. *Id.* Specifically, it noted that the parties' MDA "did not address the effect of Mr. Bogan's retirement . . . and . . . they did not foresee the change in retirement benefits[.]" *Id.* at 726. The Court of Appeals reversed, finding no material change in circumstances because husband's retirement was voluntary, foreseeable, and contemplated by the MDA. *Id.* However, the Supreme Court reversed the Court of Appeals, holding that when an obligor's retirement is objectively reasonable, it may constitute a material change in circumstances even though it was foreseeable or voluntary. *Id.* at 729. As relevant to this case, the Supreme Court noted:

Nothing we have said would prevent parties from deciding for themselves the effect of a bona fide retirement on spousal support payments. Indeed, because voluntary retirement is usually always foreseeable in some sense, parties are especially encouraged to make arrangements for this occasion in the marital dissolution agreement.

*Id.* at 729, n.5.

Where parties contract as to rights and obligations in a marital dissolution agreement, and that agreement is incorporated into the judgment of divorce, courts should construe the MDA like "other contracts [with respect to] its interpretation, its meaning and effect." As such, where the MDA itself provides for the resolution of this issue, courts should defer to the provisions of the MDA, unless it would be unconscionable to do so.

*Id.* at 730 (citing *Towner v. Towner*, 858 S.W.2d 888, 892 (Tenn. 1993)) (internal citations omitted). Because it found "no express provision dealing with modification of support upon Mr. Bogan's retirement. . . [nor any] indication that the parties even contemplated this issue[,]" the Court found that it "retain[ed] the ability to alter or modify the support payments upon a finding of a substantial and material change in circumstances." *Id.* at 731 (citation omitted).

In the instant case, Husband argues that deferring to the terms of the parties' agreement contradicts the language of Tennessee Code Annotated section 36-5-121(e)(2), which provides in relevant part that "[a]n award of rehabilitative alimony shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of a substantial and material change in circumstances." **Tenn. Code Ann. § 36-5-121(e)(2)**. However, this argument ignores not only the *Bogan* decision, but also the statute's threshold provision which states that the court may modify an alimony "award based upon a showing of a substantial and material change of circumstances; provided, that the award is subject to modification by the court based on the type of alimony awarded, the terms of the court's decree *or the terms of the parties' agreement*." **Tenn. Code Ann. § 36-5-121(a)** (emphasis added). Moreover, when the parties' agreement addresses a particular circumstance, that circumstance becomes "foreseeable," and therefore does not provide a reviewing court an appropriate basis for modifying an alimony award.[3]

---

[3]Finding no basis for a distinguishment, we also reject Husband's argument that *Bogan* should be limited to cases seeking to modify alimony *in futuro* based on the obligor's retirement.

Both the parties' Parenting Plan and MDA were incorporated into the Final Decree of Divorce. Therefore, we find the Consent Order, which modified the Parenting Plan and the MDA, was likewise incorporated. Accordingly, if we find the Consent Order speaks to Husband's decreased income, we must defer to its provisions, absent an unconscionable result. ***See Bogan***, 60 S.W.3d at 730 (citing *Towner*, 858 S.W.2d at 892).[4]

On appeal, Wife argues that Husband's alleged material change in circumstances was addressed in the Consent Order. Specifically, she cites to the Consent Order's formula for calculating alimony:

> Commencing May 1, 2008, [Husband's] alimony obligation shall be modified from $11,500 per month to a percentage of his gross income for all sources whatsoever, specifically a sum equal to one-third of his gross monthly income minus $3,000. Therefore, by way of example if [Husband] has a gross monthly income of $30,000 for June 2009, then his alimony obligation for June 2009 shall be $7,000. By way of further example if [Husband's] gross monthly income for June 2009 is $120,000, then his alimony obligation for June 2009 shall be $37,000. By way of further example if [Husband's] gross monthly income for June 2009 is $5,000, then his alimony obligation for June 2009 shall be zero although he will have paid $3,000 in child support for such month.

Wife asserts that "[t]he uncontroverted intent of this provision was to address and establish a method to calculate [Husband's] alimony obligation taking into consideration [Husband's] fluctuating income." She cites the calculation illustration in which Wife would receive no alimony as "clearly illustrat[ing]" that the parties contemplated and anticipated a decrease in Husband's income.

Husband, however, argues that he knew only that his income would be *fluctuating*, not that it would be *decreasing*. He points out that it was not until September 2009, after entry of the May 2009 Consent Order, that H&S terminated its relationship with Lucite. He claims that when the Consent Order was entered, he "did not know that his employer would lose the Lucite business altogether and could not have known that his monthly average income would be reduced to approximately $12,000.00 as opposed to a monthly average of

---

[4]***See also Bryan v. Leach***, 85 S.W.3d 136, 150 (Tenn. Ct. App. 2001) ("Where the parties see fit to include alimony obligations in their marital dissolution agreement, 'It must be presumed that the alimony provision was part of the inducement or consideration for the other provisions regarding division of the marital estate. The Courts are justified in being reluctant to disturb an alimony obligation assumed under such conditions.'" (quoting *Campbell v. Campbell*, No. 02A01-9803-CH-00073, 1998 WL 959669, at *5 (Tenn. Ct. App. Nov. 4, 1998)).

$28,000 he had in 2008." Husband maintains that the Consent Order's calculation examples are merely "extreme examples used to demonstrate the appropriate calculation of spousal support [and] do not indicate [Husband's] knowledge that his monthly income would be permanently and consistently reduced[.]"

Despite Husband's suggestion, we find that "knowledge" is not the appropriate standard for determining whether an agreement "provides for the resolution of [an] issue." *See Bogan*, 60 S.W.3d at 730 (citing *Towner*, 858 S.W.2d at 892). Instead, according to *Bogan*, the minimum standard for determining whether an agreement forecloses the modification of an alimony award is "contemplat[ion of] the effect." *See id.* at 730-31. Therefore, Husband's knowledge regarding a complete loss of the Lucite account is irrelevant, as we find the plain language of the Consent Order, specifically the calculation illustrations, demonstrates the parties' contemplation of the effect of such an occurrence.

Finally, we must determine whether enforcing the Consent Order's alimony provision would lead to an unconscionable result. *See id.* at 730 (citing *Towner*, 858 S.W.2d at 892). Husband, of course, argues that it would. We disagree.

Pursuant to the trial court order currently in effect, Husband is required to pay Wife $2,000 per month in alimony and $1,513 per month in child support, leaving him $4,987 to meet his own expenses. Yet, based upon a gross monthly income of $12,000, which Husband claims, the Consent Order sets Husband's alimony obligation at only $1,000 per month. When the Consent Order's child support obligation of $3,000 is added to this amount, Husband is left with $4,500 to meet his own expenses. Even assuming, arguendo, that the Consent Order's child support obligation is reinstated, we cannot say that the amounts owed by Husband are unconscionable. *See Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984) ("A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other."). Because we find the Consent Order contemplated the effect of Husband's decreased income and enforcement of such does not lead to an unconscionable result, we reverse the trial court's modification of Husband's alimony obligation, and we reinstate the provisions of the Consent Order with regard to alimony.

### B. Modification of Child Support

Absent a significant variance, a child support order is non-modifiable. As applicable

in this case, the Tennessee Child Support Guidelines define a significant variance as "at least a fifteen percent (15%) change between the amount of the current support order (not including any deviation amount) and the amount of the proposed presumptive support order[.]"[5] **Tenn. Comp. R. & Regs. 1240-2-4-.05(2)(c)**.

In its order modifying child support, the trial court acknowledged that the preferred method for setting a child support obligation based upon a variable income is to average the fluctuating income over an extended period. However, because it found that Husband's income was "steadily declining," the trial court based Husband's obligation upon his current income, which it set at $12,000 per month. In setting this amount, the trial court relied upon Husband's October through December 2009 commissions of $14,936, $12,651.02, and $9,556, respectively,[6] as well as the testimony of Husband and his boss, John Romelfanger. Utilizing the $12,000 current income, the trial found a significant variance existed. Accordingly, Husband's child support obligation was reduced from $3,000 as agreed to in the Consent Order, to $1,513 per month.

Wife argues that the trial court erred in failing to average Husband's fluctuating gross monthly income over an extended period. She maintains that the $12,000 figure was based "solely on speculation from [Husband] as to future income[,]"[7] as even an averaging of his income over a short period does not support such a figure.

Husband's "Monthly Commission Worksheet[s]" list the following commission subtotals:

| Pay Period | Month Paid | Commission Subtotal |
|---|---|---|
| January 2009 | February 2009 | $26,445.43 |
| February 2009 | March 2009 | $6,372.54 |
| March 2009 | April 2009 | $24,694.91 |
| April 2009 | May 2009 | $19,203.08 |
| May 2009 | June 2009 | $17,227.93 |
| June 2009 | July 2009 | $34,070.00 |
| July 2009 | August 2009 | $12,333.43 |

[5]To meet the significant variance standard, Husband's presumptive child support obligation must have decreased from $2,100 to $1,785 or less.

[6]Our review of the record reveals slightly lower numbers: $14,214.80 for October and $9,078.69 for December.

[7]When asked "What do you believe you're going to be making now?[,]" Husband answered, "I think I might can get it up to where it's around the $12,000 mark."

| August 2009 | September 2009 | $18,316.47 |
| September 2009 | October 2009 | $14,214.80 |
| October 2009 | November 2009 | $12,651.02 |
| November 2009 | December 2009 | $9,078.69 |

At his deposition, H&S Chief Executive Officer John Romelfanger testified that in May or June of 2009, Lucite contacted its pallet supplier directly, seeking to reduce its costs by eliminating H&S as the "middle man." In an attempt to retain the Lucite account, between August and October of 2009, H&S price-matched the pallet supplier's quote. Price-matching, however, forced H&S to sell at a $6,000 loss. At the hearing in this matter, Husband explained that his commission paid in November 2009 reflected such price-matching losses.[8] He also testified that the $34,070 commission paid in July 2009 was not earned in a single month, as one customer paid three invoices at once. He further explained that commissions paid through September included Lucite sales; however, at least by December 2009, such commissions had ceased.

As support for its refusal to average Husband's income, the trial court relied upon the case of *Price v. Price*, No. M1998-00840-COA-R3-CV, 2000 WL 192569 (Tenn. Ct. App. Feb. 18, 2000). In *Price*, the trial court based husband's child support obligation on his current income at the time of trial, and on appeal, wife argued that the trial court should have averaged his monthly income from years prior. **2000 WL 192569**, at *8-9. The middle section of this Court affirmed the use of husband's current income in setting child support, specifically noting that "the evidence was not that the Husband had fluctuating income levels. Rather, it was that he had experienced a decrease in income due to several legitimate factors."[9] *Id.* at *9.

In this case, not only had Husband's annual income decreased over a period of years,[10] but because his salary is entirely commission-based, his income also fluctuated from month to month. "If an obligor parent receives variable income, such as *commissions*, bonuses, or overtime pay, the variable income must be 'averaged' and added to the obligor spouse's fixed salary." *Hanselman v. Hanselman*, No. M1998-00919-COA-R3-CV, 2001 WL 252792, at *3 (Tenn. Ct. App. Mar. 15, 2001) (citing Tenn. Comp. R. & Regs. 1240-2-4-

---

[8]Husband testified that the price-matching losses negatively impacted his commission subtotal by approximately $1,000.

[9]In *Price*, husband's current monthly income at the time of trial was $19,244.32 per month; $27,376.00 per month for two years prior; and $35,798 for two years prior to that. **2010WL 192569**, at *2.

[10]John Romelfanger testified to Husband's annual income as follows: $668,118 in 2006; $555,262 in 2007; $336,337 in 2008; $220,000 anticipated in 2009.

.04(3)(b)) (emphasis added). However, because the Child Support Guidelines do not stipulate how such averaging should be made, "it is left to the courts to determine on a case-by-case basis the most appropriate way to average fluctuating income." *Id.* Our courts have consistently concluded that fluctuating incomes should, when possible, be averaged over a long-term, rather than a short-term, period. *See id; see also* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(b) ("Variable income . . . shall be averaged over a reasonable period of time consistent with the circumstances of the case[.]").

Because Husband's income fluctuates from month to month, we find that the trial court's apparent failure to average his income was error. However, based on the unique circumstances of this case, we find long-term averaging inappropriate. Instead, we find it reasonable to average Husband's commissions paid between October and December of 2009, as Lucite receipts had apparently ceased by or near this point. Over this three-month period, Husband's monthly gross income totaled $12,314.83.[11] Based on this average, Husband's presumptive child support obligation is $1,536 per month.

At this point, we must also address Wife's contention that the trial court erred in crediting Husband for five days of parenting time. Wife argues that "[t]here is, simply, no evidence in the record to support this finding." Husband concedes that the trial court "did not explain [its] reasoning for using the 5 days in the child support worksheet," but argues that this finding was within its discretion.

Husband testified that he doesn't see the parties' minor child "real often[.]" Wife similarly testified that Husband has "very" minimal contact with the child, and that she has spent the night with him only twice in the last two years. Furthermore, in its order, the trial court stated that "the evidence is consistent with Ms. Grisham's worksheet[12] that Mr. Grisham is spending virtually no significant parenting time with the minor child." Based on the parties' testimony, we find that the evidence preponderates against the trial court's finding of five days' parenting time. *See* **Tenn. R. App. P. 13(d)**.

Utilizing Husband's gross monthly income of $12,314.83, as well as his one day of parenting time with the child, Husband's presumptive child support obligation is $1,551 per

_____

[11]Because Husband testified that he would have earned an additional $1,000 in November 2009 if H&S had not sold to Lucite at a loss, we have included this additional amount in our calculation.

[12]The child support worksheets attached to Wife's "Motion to Dispose of Petition to Modify Final Decree of Divorce" list the child's "Days with Father" as zero.

month, which represents a significant variance from his support obligation pursuant to the Consent Order. Accordingly, the trial court's finding of a significant variance is affirmed, however, we remand for modification of Husband's child support obligation consistent with this opinion.

### C.    *Upward Deviation*

Next, Wife argues that the trial court lacked authority to eliminate the $900 per month upward deviation of Husband's child support obligation, as it made no specific finding that the circumstances supporting the deviation no longer existed. Wife cites the Child Support Guidelines, which provide that "[i]f the circumstances that support the deviation cease to exist, the child support order may be modified to eliminate the deviation irrespective of compliance with the significant variance requirement[.]" **Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(a)(2)**. However, this section of the Guidelines simply allows a court to modify or eliminate a deviation upon cessation of the deviation-supporting circumstances even if no significant variance between the current and presumptive child support obligations is found.

> Regarding modification of child support orders, the Guidelines further provide that:
>
> Upon a demonstration of a significant variance, the tribunal shall increase or decrease the support order as appropriate with these Guidelines unless the significant variance only exists due to a previous decision of the tribunal to deviate from the Guidelines and the circumstances that caused the deviation have not changed. If the circumstances that resulted in the deviation have not changed, but there exist other circumstances, such as an increase or decrease in income, that would lead to a significant variance between the amount of the current, excluding the deviation, and the amount of the proposed order, then the order may be modified.

**Tenn. Comp. R. & Regs. 1240-2-4-.05(5)**. We find that this section allows a court to modify a child support order, including a deviation, upon the showing of a significant variance, even where the circumstances leading to the deviation have not changed. Accordingly, because a significant variance was found in this case, the trial court did not err in eliminating the $900 upward deviation.

### D. Contempt

In its order, the trial court found that Husband "understood that he had a duty to pay alimony under the Consent Order [and that h]e failed to pay alimony due for the months of June through December 2009[.]" However, because the court believed that making his alimony payments "may have necessitated that he borrow additional funds[,]" the trial court declined to hold Husband in contempt. It did, though, order Husband to pay $7,974.83 in alimony arrearage.[13] Wife contends that the trial court's failure to hold Husband in contempt was error. We review the "trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review." *Moody v. Hutchison*, 159 S.W.3d 15, 25 (Tenn. Ct. App. 2004) (quoting *Barber v. Chapman*, No. M2003-00378-COA-R3-CV, 2004 WL 343799, at *8 (Tenn. Ct. App. Feb. 23, 2004)).

Wife argues that Husband could have met his alimony obligation without borrowing additional funds, and that even if borrowing was necessary, Husband's lack of funds resulted from his deliberate choices.

> Civil contempt actions are those brought to enforce private rights. Proof by the wife that the husband has failed to comply with the decree establishes a prima facie case of civil contempt. *Chappell v. Chappell,* 37 Tenn. App. 242, 261 S.W.2d 824, 831 (Tenn.[Ct.] App. 1952). In a civil contempt proceeding, the burden of proof is on the defendant to prove his inability to conform to the court's order, *Mayer v. Mayer,* 532 S.W.2d 54, 59 (Tenn. [Ct.] App. 1975), and that such inability was not brought about purposely as the result of his own intentional conduct. *Bradshaw v. Bradshaw,* 23 Tenn. App. 359, 133 S.W.2d 617, 619-20 (Tenn. [Ct.] App. 1939).

*Young v.* **Young**, M2003-02562-COA-R3-CV, 2005 WL 735035, at *4 (Tenn. Ct. App. Mar. 29, 2005) (quoting Merritt *v. Merritt,* No. 02A01-9108-CH-00175, 1992 WL 220160, at *5 (Tenn. Ct. App. Sept. 14, 1992)). An "Arrearage Calculation" has been included in the record, and provides in part:[14]

---

[13]The trial court explained that its calculation was based on unpaid alimony for the months of June through October 2009, representing the pay periods of April through August 2009, when Husband filed his petition for modification. However, based upon these pay periods, we calculate Husband's arrearage at $7574.83.

[14]At the hearing, Wife's counsel explained that "it's a little confusing because the way it works and how they do this is that they're almost two months behind in terms of how he pays the alimony."

| Pay Period | Month Paid | Gross Income | Alimony Owed | Alimony Pd. | Arrearage |
|---|---|---|---|---|---|
| Apr-09 | Jun-09 | $19,453.08[15] | $3,484.36 | $2,837.69 | $646.67 |
| May-09 | Jul-09 | $17,227.93 | $2,742.64 | $2,762.64 | -$20.00 |
| Jun-09 | Aug-09 | $34,070.00 | $8,356.67 | $4,454.92 | $3,901.75 |
| Jul-09 | Sep-09 | $12,333.43 | $1,111.14 | $0.00 | $1,111.14 |
| Aug-09 | Oct-09 | $18,316.47 | $3,105.49 | $1,170.22 | $1,935.27 |
| TOTAL | | $101,400.91 | $18,800.30 | $11,225.47 | $7,574.83 |

Regarding Husband's expenses, the trial court made the following findings of fact:

> Mr. Grisham pays an installment loan which was used to payoff the second mortgage on the marital residence which is $503 a month. Mr. Grisham's Affidavit listed monthly expenses of $12,004 not including alimony payments, but including $3,000 for child support and $1,039 for private school tuition. His Affidavit reveals discretionary expenses as follows: gifts $200, vacation $300, entertainment $600, miscellaneous $500. It also reveals the following expenses that without additional backup, appear inflated to the court: auto maintenance $120, clothes and accessories $300, furniture and home $250, repairs $200, legal/accounting $500.

> Mr. Grisham is remarried and pays for his step-children's cell phone and car insurance for a son. The 2 step-children still at home benefit from his payment of expenses for the household. He purchased a piece of jewelry for his wife. His current wife is not employed, but has social security income from her deceased husband and income from a pension. She helps to pay some of the household expenses.

> At a commission rate of $12,000 a month, Mr. Grisham's net pay is $8500. Under the formula as it exists in the Consent Order, after paying $3000 in child support, $1000 in alimony, $1039 for private school tuition, and $503 for the installment loan from the second mortgage on the marital residence, Mr. Grisham has $2983 remaining for living expenses. He lists $1500 for rent, $350 for electric, $160 for water/sewer, $120 for natural gas, $110 for phone and internet, $322 for [life] insurance, $600 for insurance, $600 for food, $120

---

[15]The parties dispute the April 2009 income by $650; however it is unclear which way.

for gas, among other expenses. These enumerated expenses total $3882 which exceed his remaining funds by almost $1000. His affidavit list[s] additional expenses, some of which the court has identified above in paragraph 18.[16]

The trial court's finding that Husband was unable to meet his alimony obligation set forth in the Consent Order was based upon a $12,000 gross monthly income with a net income of $8,500. While we found Husband's average monthly income paid from October to December 2009 was $12,314.83, his income was, during some months, significantly higher during the period for which contempt was considered–commissions paid between June 2009 and October 2009. Unfortunately, though, from the record, we are unable to determine Husband's net income paid between June and October 2009. Thus, we cannot discern whether Husband's expenses exceeded his receipts. Accordingly, we find that the trial court did not abuse its discretion in refusing to hold Husband in contempt.

### E. Attorney Fees

Finally, Wife argues that she is entitled to attorney fees from both the trial and appellate levels. First, she claims that she should be awarded attorney fees for defending Husband's petition to modify and for filing her contempt petition. Wife relies upon Tennessee Code Annotated section 36-5-103(c), which gives courts discretion to award attorney fees incurred in enforcing alimony or child support awards, as well as the parties' MDA, which provides:

> In the event that it shall be determined by a court of competent jurisdiction that either party shall have breached any of the covenants herein contained in this agreement or the provisions of this agreement incorporated into any divorce decree, the offending party shall pay to the other his or her reasonable attorney's fees and courts costs incurred in the enforcement of the provisions of this agreement and/or of the provisions of this agreement incorporated into and made a part of a final decree of divorce.

"In the absence of an agreement between the parties, the decision of whether to award attorney's fees in a divorce or post-divorce proceeding is largely in the discretion of the trial court, and we will not interfere on appeal except upon a clear showing of abuse of that discretion." ***Clarkson v. Clarkson***, M2006-02239-COA-R3-CV, 2007 WL 3072772, at *5

---

[16]These "additional expenses" listed in Husband's Affidavit are $120 for cable, $420 for medical and vitamins, and $70 for lawn.

(Tenn. Ct. App. Oct. 22, 2007) (citing *Hogan v. Yarbro*, No. 02A01-9905-CH-00119, 1999 WL 1097983, at *4 (Tenn. Ct. App. W.S. Oct. 5, 1999)). "However, where a marital dissolution agreement contains a provision governing the payment of attorney's fees, the interpretation of that provision is a matter of law that we review *de novo*." *Id.* (citing *Hogan*, 1999 WL 1097983, at *4). In interpreting a fee provision, we are bound by the usual rules of contract interpretation, "and the award of such fees is limited to the situation agreed to by the parties." *Id.* (citing *Segneri v. Miller*, No. M2003-01014-COA-R3-CV, 2004 WL 2357996, at *6 (Tenn. Ct. App. Oct. 19, 2004)). "When the contract provides for the recovery of attorney's fees in a certain situation, the trial court has no discretion regarding whether to award attorney's fees or not." *Id.* (citing *Seals v. Life Investors Ins. Co. of Am.*, No. M2002-01753-COA-R3-CV, 2003 WL 23093844, at *4 (Tenn. Ct. App. Dec. 30, 2003)). Because Husband failed to pay alimony as required by the Consent Order, we find the trial court erred in failing to award Wife her reasonable attorney fees and court costs expended in defending his petition to modify and in filing her petition for contempt against Husband.[17] We remand for a determination of the reasonable attorney fees and court costs incurred.

Wife also seeks attorney fees incurred on appeal. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney fees on appeal, we consider the requesting party's ability to pay such fees, his success on appeal, whether he sought the appeal in good faith, and any other equitable factors relevant in a given case. *Id.* (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). In this case, we find it equitable to decline to award attorney fees on appeal.

## V. CONCLUSION

For the aforementioned reasons, we reverse the trial court's modification of Husband's alimony obligation and we reinstate the provisions of the Consent Order with regard to alimony; we affirm the trial court's finding of a significant variance, but we remand for a modification of Husband's child support obligation consistent with this opinion; we affirm the trial court's finding regarding contempt; we award Wife her reasonable attorney fees and court costs expended in defending Husband's petition to modify and in filing her

---

[17]We award Wife her attorney fees despite affirming the trial court's refusal to hold Husband in contempt. In its order, the trial court acknowledged Husband's failure to pay alimony and it ordered him to pay an arrearage. We note that the MDA does not contemplate payment of attorney fees only when the breaching party acted wilfully.

petition for contempt, and we remand for a determination of such fees; and finally, we decline to award attorney fees on appeal. Costs of this appeal are taxed equally to Appellant, Elizabeth Ann Grisham, and her surety, and Appellee, Mark Alan Grisham.


_____
ALAN E. HIGHERS, P.J., W.S.