T.C. Memo. 2005-50

UNITED STATES TAX COURT

PAUL H. & JUDY E. ROGERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11696-02.                    Filed March 17, 2005.

Paul H. & Judy E. Rogers, pro se.

<u>James L. May</u>, for respondent.


MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  For alimony to be deductible, the obligation
to pay it must end with the life of its recipient.  But when Paul
Rogers divorced his first wife, in 1992, he agreed to pay her
$225 a week for ten years with no express condition that she be
alive to receive it.  Rogers and his current wife then deducted
those payments as alimony on their 2000 tax return.  The
Commissioner disallowed the deduction because he concluded the

payment obligation would not end upon the first Mrs. Rogers'
death.  Rogers disagrees and says that his obligation to pay
would end on her death as a matter of state law.[1]

Deciding this Federal tax case therefore requires us to
closely examine the divorce law of Tennessee, the State where
Rogers wed, divorced, remarried, and resided when he filed the
petition in this case.

### Background

Rogers' first wife sued him for divorce in 1991 and quickly
moved to get alimony *pendente lite*.  In July 1991, the Tennessee
Circuit Court handling her case ordered Rogers to pay $225 per
week while the case was pending.  The order specifically provided
that the "payments are to be made directly from the ABC Insurance
Center to the plaintiff.  The entire amount paid by ABC Insurance
Center shall be taxable income to the defendant."

The estranged couple soon negotiated a Marital Dissolution
Agreement, which was adopted by the Circuit Court as part of its
final decree granting the divorce in March 1992.  The Dissolution
Agreement continued Rogers' weekly obligation:

> The Husband shall pay as lump sum alimony to
> the Wife in installments two hundred twenty-
> five and no/100ths ($225.00) dollars per
> week, beginning immediately, and continuing

---

[1] Paul Rogers' second wife, Judy, is a petitioner only
because she filed a joint return with him for the 2000 tax year.
All references to "Rogers" are to him alone.

each week hereafter through July, 2002. Said
alimony payments shall be received by the
Wife directly from Husband's payment from the
ABC Insurance Center. Should the Husband die
prior to the full payment of this alimony,
the Wife shall continue to receive said
payment directly from ABC Insurance Center
through the term of the contract.

The Circuit Court issued an Agreed Final Decree in September 1992 which changed some provisions in the original Dissolution Agreement--mostly those dividing marital property--but left intact the paragraph requiring Rogers to pay $225/week through July 2002.

The parties stipulated all the facts, including the fact that the payments continued to be made throughout 2000, and the case was submitted for decision under Rule 122.[2]

## Discussion

Payments incident to a divorce traditionally fell into one of two categories for Federal tax law: property settlements or alimony. Property settlements are a division of marital property, and for many years have been neither deductible from the income of the paying spouse nor includible in the income of the receiving spouse. Alimony is a division of income, and for many years has been deductible by the paying spouse and includible by the receiving spouse. See, e.g., <u>Yoakum v.</u>

---

[2] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code as in effect for 2000, unless otherwise noted.

Commissioner, 82 T.C. 128, 134 (1984).

Sections 215 and 71 of the Code are where these general principles take specific shape in the current Code.  Section 215, which allows a deduction for alimony paid, defines "alimony" as a payment that meets the four tests spelled out in section 71(b). One of these is section 71(b)(1)(D), which requires that "there [be] no liability to make any such payment for any period after the death of the payee spouse."[3]  Sec. 71(b)(1)(D).  Limiting deductibility to obligations that end with the death of the payee stops taxpayers from disguising property settlements as alimony. But one recurring problem has been how to tell whether a particular obligation to pay alimony really would stop at death. For a time, the Code had a strict bright-line test: deductibility was denied unless there was an express provision in the divorce decree or separation instrument itself ending payments upon the death of the payee spouse.  26 U.S.C. sec. 71(b)(1)(D) (1984).  In 1986, though, Congress softened section 71(b) to allow deductibility without such an express provision, but only if state law would end the obligation at death anyway.

---

[3] We note that under sec. 1.71-1T(b) A-5, Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984), "Transfers of services or property (including a debt instrument of a third party or an annuity contract) * * * do not qualify as alimony or separate maintenance payments."  The parties never addressed whether weekly payments made from an insurance company to a former wife fall within this exclusion, and neither do we.

The first difficulty in this area of law is that different states define "alimony" differently--in some states it means what it does in Federal tax law, but in others it can mean something quite different.  See, e.g., <u>Hoover v. Commissioner</u>, T.C. Memo. 1995-183 (1995), (Ohio using "alimony" to mean both property settlements and periodic support payments), affd. 102 F.3d 842 (6th Cir. 1996).  And the dichotomy between property settlements and alimony that tax law draws--grows steadily murkier as different types of post-divorce payments proliferate.  Tennessee divorce law, for example, used to classify all alimony as either *in solido* (roughly equivalent to property settlements) or *in futuro* (roughly equivalent to section 71 alimony).  <u>Bryan v. Leach</u>, 85 S.W.3d 136, 145 (Tenn. Ct. App. 2001).  Then, in 1984, the Tennessee legislature created "rehabilitative alimony," explaining in the new statute:

> It is the intent of the general assembly
> that a spouse who is economically
> disadvantaged, relative to the other spouse,
> be rehabilitated whenever possible by the
> granting of an order for payment of
> rehabilitative, temporary support and
> maintenance. * * *

Acts 1984, ch. 818, secs. 1-3, codified in Tenn. Code Ann. sec. 36-5-101(d)(1) (2001 & Supp. 2004); see also <u>Cranford v. Cranford</u>, 772 S.W.2d 48, 50-51 (Tenn. Ct. App. 1989), revd. on other grounds at <u>Bogan v. Bogan</u>, 60 S.W.3d 721 (Tenn. 2001); <u>Gotten v. Gotten</u>, 748 S.W.2d 430 (Tenn. Ct. App. 1987).

It is unsurprising, then, that the parties in this case fight their battle as one of classification--the Commissioner argues that the disputed payments are alimony *in solido*, see Towner v. Towner, 858 S.W.2d 888, 891 (Tenn. 1993), that the obligation to pay alimony *in solido* does not end with the death of the payee spouse under Tennessee law, and that the payments are thus just part of the nondeductible property settlement between the Rogers.  Rogers insists that the payments are rehabilitative alimony, and so would end at his former wife's death by the express command of Tennessee law that "rehabilitative support and maintenance shall terminate upon the death of the recipient."  Tenn. Code Ann. sec. 36-5-101(d)(2).

We disagree at the outset with Rogers on this point.  The section he cites became part of Tennessee law in 1993, after the divorce proceedings between him and his former wife were complete.  1993 Tenn. Pub. Acts 243.  Under Tennessee law, substantive changes in divorce law will not affect divorces that occur before the enactment of the law.  Waddey v. Waddey, 6 S.W.3d 230, 232 n.1. (Tenn. 1999); Bryan v. Leach, 85 S.W.3d 136, 143 (Tenn. Ct. App. 2001).  So we must refine our analysis to try to determine what a Tennessee court would do under the law in effect in 1992.

Under the law as it stood before the 1993 amendment, however, it was less than clear whether the legislature had made

rehabilitation a new goal of existing forms of alimony or made a new form of alimony called "rehabilitative". Then, in the early 1990s, the Tennessee Supreme Court held in a pair of cases that Tennessee still recognized only two forms of alimony--*in solido* and *in futuro*. In Isbell v. Isbell, 816 S.W.2d 735 (Tenn. 1991), the Court created a default rule of construction for awards of rehabilitative alimony like the one at issue in this case:

> But where the rehabilitative award has been made for a fixed amount, the award must be considered non-modifiable, even if it is to be paid in installments and not in a lump sum. The certainty that results from such a rule benefits both parties, allowing each to make long-range financial plans for their own futures and for the future of any children affected * * *.

Id. at 739.[4]

Shortly after Isbell, the Court decided Self v. Self, 861 S.W.2d 360 (Tenn. 1993). Self also arose from an order to pay a fixed sum for a fixed term, in this case $3,000 per month for 48 months. The trial court that ordered these payments explicitly stated that it meant then to allow Mrs. Self to become financially independent:

> the wife is both capable of and entitled to

---

[4] The Court did emphasize that this was only a default rule --carefully observing that a trial court could place conditions on the award of rehabilitative alimony or ensure that the default rule wouldn't apply by not making the award for a sum certain. Isbell, 816 S.W.2d at 739 n.1. It also noted that the parties themselves could impose conditions on rehabilitative alimony by their own agreement. Id. at 739.

> rehabilitation * * * [t]his will, if Mrs.
> Self desires, allow support for her in an
> amount sufficient to allow her to be self
> supporting and obtain a Bachelor's Degree in
> a field of her choosing.  The Court feels
> that * * * she should be rehabilitated to
> such an extent that she can be gainfully
> employed and after four years take her place
> in the economic market place. * * *

Id.  On these facts, Mrs. Self had a strong argument that the

payments--fixed in amount and term--were rehabilitative alimony:

The Court had made a specific finding that she was capable of

rehabilitation and fixed the payments to pay for rehabilitation.

Unlike the Rogers' case, moreover, the trial court's order in

Self expressly stated that the payments would cease upon Mrs.

Self's death or remarriage.  Then, four years after the trial

court entered its order, Mrs. Self moved to keep the alimony

payments coming because, despite a good faith effort, she had yet

to be rehabilitated.  The trial court dismissed her petition,

holding that it lacked jurisdiction because rehabilitative

alimony was a form of alimony *in solido,* and alimony *in solido* is

unmodifiable under Tennessee law.  See McKee v. McKee, 655 S.W.2d

164, 165 (Tenn. Ct. App. 1983).

The Tennessee Supreme Court agreed.  It reasoned that

> [t]he critical factor in determining whether
> an award for the support and maintenance of a
> former spouse is subject to modification is
> the initial finding by the trial court
> regarding the relative economic conditions of
> the parties and the feasibility of
> rehabilitation of the disadvantaged spouse.

Self, 861 S.W.2d at 361. The Court explained that under
Tennessee law, the only situation justifying long-term support
and maintenance would be where there was economic disadvantage to
one of the parties and rehabilitation was "not feasible." Thus,
the trial court's finding that Mrs. Self was eligible for
rehabilitation precluded the awarding of open-ended, long-term
support in the form of alimony *in futuro*. Thus the Court found
the alimony in Self to be unmodifiable. See also Campbell v.
Campbell, 832 S.W.2d 31, 32 (Tenn. Ct. App. 1991) (unmodifiable
even if rehabilitation prevented by onset of serious illness).

Isbell and Self indicate that, for a 1992 divorce, alimony
like the payments here--fixed in amount and for a definite term--
would be classified as alimony *in solido* even if made with a
rehabilitative purpose. And, as a general rule, an obligation to
pay alimony *in solido* does not end with the death of the payee
spouse. Isbell, 816 S.W.2d at 739. Applying this general rule
to the stipulated facts of this case strongly suggests that even
if Rogers is right in characterizing the disputed payments as
rehabilitative alimony, he would still lose because that would
just make them alimony *in solido*.

The discerning reader, though, would have noted that this
characterization is true only as a default rule--in Self itself,
the Court ordered the payments to stop on the death of Mrs. Self.
And the parties here argue about whether a similar intent can be

found in the Rogers' Dissolution Agreement and Final Decree.

The general rule in Tennessee is that a divorce decree is to be construed like other written instruments.  And this means that the parol evidence rule applies:

> The general rules of evidence regarding the admission of parol evidence and the construction of written instruments also apply to the admission of parol evidence in the construction of a divorce decree.  The test as to the application of the parol evidence rule is whether the testimony as to oral agreements or negotiations varies or contradicts the instrument in question or merely explains it.

Hale v. Hale, 838 S.W.2d 206, 208-209 (Tenn. Ct. App. 1992) (internal citations omitted).

The instruments we are construing would have benefited from an explanation.  The testimony of Rogers or his former wife or anyone else familiar with the original divorce proceeding, and the production of her tax returns or the ABC Insurance Center contract would have gone far in establishing the intent of the parties.  But as the record currently stands, we are forced to draw inferences from the stipulations and documents that have been submitted by the parties.  (There is correspondence in the record between Rogers and respondent's counsel asserting that Rogers' ex-wife included the payments as income on her own return, but this is at most hearsay, and has at most an attenuated connection to what the Rogers intended would happen if Rogers' ex-wife died, see Cunningham v. Commissioner, T.C. Memo.

1999-474.)

We begin, as do the parties, with the language of the order *pendente lite*. For Rogers, this order's language supports his position that the Circuit Court recognized that his ex-wife was in a position of relative financial disadvantage. She had spent her entire adult life as a housewife reliant upon his income, and at age 52 was ten years too young to collect Social Security. He argues that the weekly payments could only have been justified under Tennessee law if the Circuit Court judge found them to be needed for support and maintenance of a financially struggling spouse. 1 Tenn. Jur. Divorce & Alimony § 35 (2003). He then asks us to infer that when this temporary obligation was continued in the final decree it reflected an implicit finding by the Circuit Court that his ex-wife would continue to be economically disadvantaged. He implies that we should reason from this that the Rogers intended the rehabilitative alimony in this case be classified as alimony *in futuro*--the sort of alimony that in 1992 Tennessee would stop at the death of the payee spouse.

We disagree, and side with the Commissioner on this point. The better conclusion from the evidence at hand is that the alimony here wasn't even intended to be rehabilitative. The Commissioner emphasizes language added in the Dissolution Agreement and Final Decree that refers to the weekly payments as

"lump sum alimony."  According to him, "lump sum alimony" is a synonym in Tennessee law for alimony *in solido.*  And while Rogers is right that the labels that divorced couples attach to their payments are not determinative, <u>Bowers v. Bowers</u>, 1997 WL 530771 (Tenn. Ct. App., Aug 28, 1997), they are at least evidence of a couple's intent, <u>Cunningham</u>, T.C. Memo. 1999-474.

We also find support in the sentence in the order granting alimony *pendente lite* that states that the $225/week would be taxable to Rogers.  When read together with the description in the Dissolution Agreement of the payments as to be received directly from ABC Insurance Center *through the term of the contract*, this does look more like an assignment of income from property (i.e., the contract with ABC Insurance Center) that in some way remained Rogers'.  This undermines Rogers' argument that the *pendente lite* award necessarily indicates the Circuit Court had in mind an award of rehabilitative alimony--to the contrary, it suggests that the trial court in the divorce proceeding viewed the award as a division of property.  It is true that the clause stating the payments would be taxable to Rogers is not in the final decree, but even if we infer from the deletion of that language that they were intended to be taxable to his ex-wife, we can still find no clear intent regarding what would happen had she died.

We therefore conclude that the payments at issue do not satisfy the requirement of section 71(b)(1)(D).  They are therefore nondeductible under section 215.

<u>Decision will be entered</u>

<u>for Respondent</u>.