# United States Tax Court

T.C. Memo. 2024-18

JOSEPH ANTHONY MARTINO, JR.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 17336-21.                    Filed February 7, 2024.

———————

*Mark C. Harper*, for petitioner.

*Ephraim A. Lucas* and *John W. Sheffield III*, for respondent.


MEMORANDUM OPINION

LAUBER, *Judge*: With respect to petitioner's Federal income tax for 2017 and 2018, the Internal Revenue Service (IRS or respondent) determined deficiencies of $11,856 and $8,194, respectively, plus an accuracy-related penalty for 2017 (since conceded). Currently before the Court are the parties' Cross-Motions for Summary Judgment. The sole issue for decision is whether petitioner may deduct, as "alimony," certain payments he made to his ex-wife during 2017 and 2018.

Resolution of this question is governed by the law as it existed before enactment of the Tax Cuts and Jobs Act of 2017 (Act), Pub. L. No. 115-97, § 11051, 131 Stat. 2054, 2089–90. That law generally eliminated the alimony deduction in the case of divorce or separation agreements executed after December 31, 2018. *See id.* During the tax years at issue section 215(a)[1] allowed a deduction for "alimony or separate

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, and Rule references are to

[*2] maintenance payments." Respondent contends that the deductions petitioner claimed were properly disallowed because his payments to his ex-wife did not qualify as "alimony" as defined in section 71(b). Agreeing with respondent on this point, we will grant his Cross-Motion and deny petitioner's.

*Background*

The following facts are derived from the parties' pleadings and Motion papers, including the attached Declarations and Exhibits. *See* Rule 121(c). Petitioner resided in Georgia when he timely petitioned this Court.

Petitioner married Cindy Roberts, and the couple had two children. On November 21, 2005, in anticipation of divorce, petitioner and Ms. Roberts entered into a marital settlement agreement (Settlement Agreement) addressing numerous issues, including the division of marital assets, child support, and "taxable periodic alimony" to be paid by petitioner to Ms. Roberts. The Settlement Agreement was approved by the Superior Court of Forsyth County, Georgia (Superior Court).

Paragraph 1 of the Settlement Agreement, captioned "Equitable Division," specified an allocation of assets that was "meant to be an equitable division of the marital property, except as specifically provided herein, and said division is non-taxable to either party." Paragraph 6 provided that petitioner would have exclusive possession, ownership, and use of the marital residence and 182 acres of adjacent land (Property) in exchange for a $2.2 million payment to Ms. Roberts. That payment was due on the earlier of September 1, 2006, or the date the Property was sold. The Settlement Agreement separately provided, in paragraphs 16 and 17, that petitioner was obligated to make monthly payments to Ms. Roberts of $3,000 "as taxable periodic alimony" and to make monthly payments of $2,000 per child as child support. Upon the termination of child support for one of the two children, monthly payments of $3,000 were to be paid to support the other child.

On March 10, 2006, the Superior Court issued a Final Judgment and Decree of Divorce (Divorce Decree) dissolving the marriage. The fourth paragraph of the Divorce Decree incorporated the Settlement Agreement "as if quoted *verbatim*." On December 19, 2006, the parties signed a Consent Order (Order) that modified petitioner's obligations

the Tax Court Rules of Practice and Procedure. We round monetary amounts to the nearest dollar.

**[\*3]** under the Divorce Decree. In exchange for other concessions, petitioner was now to pay a total of $3.5 million to his ex-wife for her interest in the Property. That sum was to be paid as follows: (1) $250,000 by December 21, 2006, (2) $250,000 by February 21, 2007, and (3) $3 million by the earlier of December 31, 2007, or the date the Property was sold. The Order stated that "as part of the equitable division of marital property, all of the above-referenced payments [i.e., the $3.5 million] shall be tax-free" to Ms. Roberts.

Petitioner made the initial $250,000 payment but failed to make any further payments. In March 2007 Ms. Roberts accordingly filed a Motion for Contempt, seeking payment of the $250,000 installment that was due the previous month. On April 26, 2007, the Superior Court issued an order directing petitioner to pay that sum, plus interest.

In an effort to ensure that the upcoming $3 million installment was also paid, the Superior Court ordered petitioner to execute a "Deed to Secure Debt." This Deed conveyed to Ms. Roberts an interest in the Property—she had previously relinquished her interests by quitclaim deed—for the express purpose of allowing her to foreclose on the Property if she did not receive the $3 million payment. The Deed was to be executed on April 23, 2007. The Superior Court noted that this Deed evidenced petitioner's obligation to pay Ms. Roberts "the sum of $3,000,000 on the earlier of December 31, 2007, or upon the sale of the [P]roperty to another, pursuant to this Court's December 19, 2006, Order."

In late 2007 third-party lenders foreclosed on the Property after petitioner defaulted on his obligations to them. Petitioner made no payment to Ms. Roberts by year-end 2007, and she then filed a second Motion for Contempt. In February 2008 the Superior Court issued an order finding petitioner in "willful contempt" because he had "failed to pay any monies toward the satisfaction of a $3,000,000.00 obligation created by the parties' divorce agreement and due on December 31, 2007." The order directed petitioner to pay $3 million to Ms. Roberts within 90 days. Unable or unwilling to do so, petitioner filed for bankruptcy. He was granted a bankruptcy discharge in April 2009, but his $3 million obligation to Ms. Roberts was ruled nondischargeable.

The Superior Court conducted hearings in May and June 2010 to consider petitioner's ongoing failure to make payments toward his $3 million property settlement obligation. The Superior Court ascertained that petitioner was receiving income of $25,000 per month

[*4] (mostly tax-free) from two disability insurance policies. The Superior Court determined that "it is necessary at this time to impose a remedy that addresses Ms. Roberts' need to be paid funds that are owed pursuant to the divorce decree."

On the basis of findings made during these hearings, the Superior Court in June 2010 imposed a new payment schedule, pursuant to which petitioner would discharge his property settlement obligation in installments. The Superior Court ordered petitioner to pay Ms. Roberts: (1) $50,000 immediately; (2) "$10,000 per month toward the $3,000,000 obligation for a period of 12 months"; and (3) "$25,000 per month [thereafter] until the full obligation, including interest, is paid in full." The Superior Court "retain[ed] jurisdiction to enter any additional or modified orders," and it directed petitioner to maintain an irrevocable life insurance policy, with Ms. Roberts as beneficiary, "in an amount equivalent to his outstanding obligation."

On September 3, 2010, the Superior Court issued two Income Deduction Orders (IDOs), directing that amounts due on petitioner's disability insurance policies be withheld to satisfy his obligations under the new payment schedule. Paragraph (a), captioned "Unpaid Arrearage," stated that the amounts thus withheld were "for the previously owed arrearage due to [Ms. Roberts] in the amount of THREE MILLION DOLLARS ($3,000,000) plus interest at the rate of SEVEN PERCENT (7%) per annum commencing on January 1, 2008, pursuant to this Court's February 29, 2008, Order Granting Plaintiff's Motion for Contempt."

During the ensuing six years petitioner made regular monthly payments, via withholding from his insurance policies, toward his outstanding $3 million obligation to Ms. Roberts. But he became delinquent with respect to certain other obligations, including his obligation to pay alimony. In October 2016 the Superior Court issued a Consent Order specifying how his monthly payments were to be applied to these outstanding arrearages.

The Consent Order directed that, beginning October 1, 2016, the $25,000 monthly payments were first to be applied to the balances of five specified obligations, including past-due alimony of $27,000. When those obligations (including alimony) were fully paid, all succeeding payments were to be applied to the "outstanding balance due on the property division payment that was in the original principal amount of

[*5] $3 million, plus interest." The Consent Order confirmed that both IDOs were to remain in force.

During 2016 petitioner made the required monthly payments of $25,000 to Ms. Roberts. The first nine payments (totaling $225,000) were applied to his property settlement obligation. Pursuant to the October 2016 Consent Order, the last three payments (totaling $75,000) were applied to the other arrearages mentioned above. By year-end 2016 petitioner had fully discharged the past-due amounts he owed Ms. Roberts for alimony, child support, and uninsured medical expenses.

During 2017 petitioner again made the required monthly payments of $25,000 (totaling $300,000). Pursuant to the October 2016 Consent Order, these payments were first applied to satisfy his past-due obligations to defray Ms. Roberts' attorney's fees ($22,670) and to pay premiums on the life insurance policy required by the Superior Court's June 2010 order ($102,353). Those payments totaled $125,023. The balance of the $300,000, or $174,977, was applied toward petitioner's outstanding $3 million property settlement obligation.

During 2018 petitioner again made the required monthly payments of $25,000. As of December 31, 2017, he had fully discharged all of the arrearages addressed in the 2016 Consent Order. Thus, the entire $300,000 for 2018 was applied toward petitioner's outstanding $3 million property settlement obligation.

Petitioner did not timely file a Federal income tax return for 2017 or 2018. In November 2018 he filed a delinquent return for 2017 on which he claimed no deduction for alimony and a $43,343 deduction for a net operating loss (NOL). In May 2019 he filed an amended return for 2017, disclaiming the NOL deduction and claiming an alimony deduction for the $300,000 paid to Ms. Roberts. The IRS did not accept his amended return for filing. In November 2019 he filed a delinquent return for 2018, on which he again claimed a $300,000 alimony deduction.

The IRS selected petitioner's 2017 and 2018 returns for examination. On February 2, 2021, the IRS issued him a timely notice of deficiency, disallowing the NOL deduction claimed on his original 2017 return and determining that the $300,000 paid to Ms. Roberts in 2018 was not deductible because it was not "alimony."

Petitioner timely petitioned this Court for redetermination of the deficiencies. In September 2022 he filed a Motion for Summary Judgment urging that he is entitled in each year to a $300,000 alimony

[*6] deduction. Respondent timely objected to the Motion and filed a Cross-Motion for Summary Judgment. In his reply to the Cross-Motion, petitioner does not contest the disallowance of the $43,343 NOL deduction claimed on his original 2017 return.

*Discussion*

I.     *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). The parties agree on all questions of basic fact and have expressed that consensus by filing Cross-Motions for Summary Judgment. We conclude that the question presented is appropriate for summary adjudication.

II.     *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to the claimed deductions. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Hradesky v. Commissioner*, 65 T.C. 87, 90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). The burden of proof may shift to the Commissioner under certain circumstances if the taxpayer comes forward with credible evidence regarding a factual issue relevant to ascertaining his liability. *See* § 7491(a)(1). Petitioner does not contend, nor does the evidence establish, that the burden shifts to respondent as to any issue of fact.

III.     *Alimony Deduction*

A.     *Statutory Background*

Payments incident to divorce commonly fall into one of two categories: alimony or property settlements. In general, alimony is a division of income, and a property settlement is a division of marital property. *See Rogers v. Commissioner*, T.C. Memo. 2005-50, 89 T.C.M. (CCH) 850, 851. A property settlement incident to a divorce is not a taxable

**[\*7]** event and does not give rise to gain or loss. *See* § 1041; *Estate of Goldman v. Commissioner*, 112 T.C. 317, 323 (1999), *aff'd sub nom. Schutter v. Commissioner*, 242 F.3d 390 (10th Cir. 2000) (unpublished table decision); *Peery v. Commissioner*, T.C. Memo. 2014-151, 108 T.C.M. (CCH) 91, 93.

During the tax years at issue, alimony was treated differently: It was generally deductible by the payor spouse and taxable to the payee. Section 215 allowed a deduction for "any alimony or separate maintenance payment (as defined in section 71(b)) which is includible in the income of the recipient under section 71." *See* § 215(a) and (b). And section 71(a) provided that "[g]ross income includes amounts received as alimony or separate maintenance payments," as that term was defined in section 71(b).[2]

Section 71(b) defined an "alimony or separate maintenance payment" as "any payment in cash" that satisfied four specified conditions. First, the payment must be received by a spouse "under a divorce or separation instrument." § 71(b)(1)(A). Second, the divorce or separation instrument must not designate the payment "as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215." § 71(b)(1)(B). Third, the payor and payee spouses must not be "members of the same household at the time such payment is made." § 71(b)(1)(C). Fourth, there must be no liability to make any such payment (or substitute therefor) "after the death of the payee spouse." § 71(b)(1)(D). When enacting this definition in 1984, Congress intended "to establish an objective standard to distinguish between a payment received in the division of property . . . and a payment received as spousal support." *Estate of Goldman*, 112 T.C. at 322 (citing legislative history).

Petitioner contends that his $300,000 payments to Ms. Roberts in 2017 and 2018 constituted deductible alimony. Respondent contends that the payments were components of a marital property settlement (or otherwise failed to qualify as alimony). While not disputing satisfaction of the first and third conditions set forth above, respondent contends

---

[2] Sections 71 and 215 were both stricken from the Code by Act § 11051(a), (b)(1)(B), 131 Stat. at 2089–90. These amendments were generally effective for "any divorce or separation instrument . . . executed after December 31, 2018." *Id.* § 11051(c)(1), 131 Stat. at 2090. However, prior law continued to apply for agreements executed on or before December 31, 2018, if the agreement was modified thereafter and "if the modification expressly provides that the amendments made by this section apply to such modification." *Id.* § 11051(c)(2).

[*8] that petitioner's payments failed to meet the requirements of section 71(b)(1)(B) and (D). Because the statutory requirements are in the conjunctive, all must be met in order for a taxpayer to be allowed a deduction. Concluding as we do that petitioner's payments do not meet the condition specified in section 71(b)(1)(B), we need not consider respondent's alternative argument.

### B.    *Analysis*

Congress defined the term "divorce or separation instrument" broadly. The term includes "a decree of divorce or separate maintenance or a written instrument incident to such a decree," a "written separation agreement," or another form of "decree . . . requiring a spouse to make payments for the support or maintenance of the other spouse." § 71(b)(2). Section 71(b)(1)(B) provides that, in order for a payment to be considered alimony, "the divorce or separation instrument [must] not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215."

Section 71(b)(1)(B) is drafted somewhat unartfully, containing as it does a double—indeed a triple—negative. Rephrased in simpler terms, this provision requires us to determine whether the instrument "contains a nonalimony designation." *Estate of Goldman*, 112 T.C. at 323. This inquiry is a practical, not a technical, one. The instrument "need not mimic the statutory language," e.g., by "specifically refer[ring] to sections 71 and 215." *Ibid.* Rather, "the divorce or separation instrument contains a nonalimony designation if the substance of such a designation is reflected in the instrument." *Ibid.*; *see Faust v. Commissioner*, T.C. Memo. 2019-105, 118 T.C.M. (CCH) 177, 179–80 (noting that a nonalimony designation must be "clearly reflected" in the substance of the divorce instrument).

Given the litigation history of the divorce proceedings here, no single document specifies the precise payments to which Ms. Roberts was entitled. Rather, the "divorce or separation instrument" consists of multiple documents executed over a ten-year period, including the Settlement Agreement, the Divorce Decree, and a series of Consent Orders and Contempt Orders. The last of these documents was the Consent Order issued in October 2016. From beginning to end, the consistent import of this instrument is that petitioner's payments toward what became a $3 million obligation did not constitute alimony but were installment payments in discharge of a property settlement.

**[*9]**   The 2005 Settlement Agreement, incorporated verbatim in the March 2006 Divorce Decree, specified that petitioner would retain ownership of the marital residence in exchange for a $2.2 million payment to Ms. Roberts.  That paragraph of the Agreement plainly specified a property settlement.  In other paragraphs the Agreement separately provided for "taxable periodic alimony" ($3,000 per month) and child support ($2,000 per child per month).  The original Divorce Decree thus contained an explicit "nonalimony designation" for the $2.2 million obligation.

The December 2006 Order increased the $2.2 million obligation to $3.5 million and provided that this sum was to be paid in three installments.  The Superior Court ordered two payments of $250,000 (both of which petitioner eventually made) and a final "balloon payment" of $3 million due December 31, 2007, at the latest.  The Order stated that "all of the above-reference payments shall be tax-free to Ms. Roberts." This Order thus included an explicit "nonalimony designation" for all payments made toward the $3.5 million obligation.

During 2007–2010 the focus of the parties' dispute was petitioner's ongoing failure (exacerbated by his bankruptcy) to make the final $3 million payment toward the marital property settlement.  In June 2010, after several Contempt Orders, the Superior Court imposed a new payment schedule that required petitioner to discharge his $3 million obligation in installments, viz, by paying Ms. Roberts $50,000 immediately, $10,000 per month for one year, and then "$25,000 per month until the full obligation, including interest, is paid in full."  In September 2010 the Superior Court issued IDOs directing that these monthly payments were to be withheld from petitioner's disability insurance policies. The Superior Court's orders explicitly stated that the amounts thus withheld were "for the previously owed arrearage due to [Ms. Roberts] in the amount of THREE MILLION DOLLARS ($3,000,000) plus interest."  These orders of the Superior Court again contained an explicit "nonalimony designation" for all payments made toward the $3 million obligation.[3]

---

[3] Petitioner appears to equate the IDOs with "Domestic Relations Support Orders" under Georgia law and says that IDOs cannot be used to effect an "equitable division of property."  He offers no plausible support for this:  The "equitable division of property" was effected by the Settlement Agreement and the Divorce Decree.  The IDOs did not divide any property.  Rather, they were essentially orders of garnishment, i.e., a mechanism for ensuring that petitioner made the property settlement payments that the Superior Court had separately ordered him to make.

**[\*10]** For six years petitioner made the required monthly payments toward his $3 million property settlement obligation, while becoming delinquent in certain of his other obligations to Ms. Roberts. This precipitated the October 2016 Consent Order, which was the final component of the "divorce or separation instrument." This Consent Order specified how petitioner's monthly payments would be allocated between the $3 million obligation and his other arrearages.

The Consent Order directed that, beginning October 1, 2016, the $25,000 monthly payments were to be applied first to petitioner's arrearages on five other obligations, including past-due alimony of $27,000. When those arrearages were fully discharged, all succeeding payments were to be applied to the "outstanding balance due on the property division payment that was in the original principal amount of $3 million, plus interest." Petitioner's final three payments during 2016 (totaling $75,000) were applied to those other arrearages, and by year-end 2016 he had fully discharged his past-due obligations for alimony, child support, and Ms. Roberts' uninsured medical expenses.

This brings us to the $300,000 annual payments petitioner made in 2017 and 2018, for which he is claiming alimony deductions. During 2017 his payments were first applied to his final two arrearages, i.e., his obligations to defray Ms. Roberts' attorney's fees and to pay premiums on the life insurance policy required by the Superior Court's June 2010 order. Those amounts totaled $125,023. The balance of the $300,000, or $174,977, was applied to the unpaid balance of his $3 million property settlement obligation. By year-end 2017 he had fully discharged all of his other arrearages, so the entire $300,000 for 2018 was applied toward the unpaid balance of his $3 million property settlement obligation. In short, none of the $600,000 he paid Ms. Roberts during 2017 and 2018 was paid as "alimony."[4]

---

[4] This Court has held that, in certain situations, the payment of health insurance premiums for an ex-spouse incident to divorce may be in the nature of alimony. *See Leyh v. Commissioner*, 157 T.C. 86, 94 (2021). Petitioner was responsible for Ms. Roberts' uninsured medical expenses, but he fully discharged his arrearage in that respect during 2016. His 2017 payments discharged his $102,353 arrearage for life insurance premiums. But the Superior Court ordered the life insurance policy to backstop his $3 million property settlement obligation; that policy had nothing to do with his obligation to pay alimony. In any event, petitioner has not argued for a reduced 2017 alimony deduction of $102,353, and we deem that issue conceded. *See* Rule 34(b)(1)(G) (providing that an issue not raised in a taxpayer's petition is generally deemed conceded); *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (holding that an argument not pursued on brief may be considered "abandoned").

**[\*11]**  Petitioner urges that he is entitled to alimony deductions because his 2017 and 2018 payments were "periodic" payments made directly to his ex-wife.  But the manner in which the payments were made is not dispositive (or even relevant) under section 71(b)(1)(B).  The Divorce Decree included a "nonalimony designation" that ordered petitioner to pay the marital property settlement in a lump sum.  But he defaulted on that obligation, filed for bankruptcy, and became unable to pay his $3 million obligation in a lump sum.  That is why the Superior Court in June 2010 imposed a new payment schedule, ordering that petitioner discharge the $3 million property settlement obligation from June 2011 onwards by paying installments of "$25,000 per month until the full obligation, including interest, is paid in full."  The switch from a lump-sum payment to installment payments did not convert the property settlement to alimony.  It was simply a consequence of petitioner's apparent inability to discharge his property settlement obligation in any other way.

Finally, petitioner urges that he is entitled to alimony deductions because the October 2016 Consent Order—the final order issued by the Superior Court—does not explicitly state that the payments "were not includible in the gross income" of Ms. Roberts.  *See* § 71(b)(1)(B).  But as we have previously held, the divorce or separation instrument "need not mimic the statutory language" by "specifically refer[ring] to sections 71 and 215."  *Estate of Goldman*, 112 T.C. at 323.  Rather, we must ascertain whether "the substance of [a nonalimony] designation is reflected in the instrument."  *Ibid.*; *see Faust*, 118 T.C.M. (CCH) at 179–80.

We agree that the October 2016 Consent Order, as the final order in the series, should be given special weight in ascertaining the meaning of the integrated "divorce or separation instrument."  *See, e.g.*, *Lehrer v. Commissioner*, T.C. Memo. 1980-256, 40 T.C.M. (CCH) 680, 685.  But the critical question is whether this final order "modif[ied], chang[ed], or replac[ed] the provisions of the initial agreement with respect to alimony."  *Ibid.*  All prior orders of the Superior Court contained an explicit "nonalimony designation."  This final order did not change the state of play in any way helpful to petitioner.

The October 2016 Consent Order did modify the Superior Court's prior directives, which had specified that the $25,000 monthly payments be allocated *exclusively* to the unpaid balance of the $3 million property settlement.  This final order directed that, beginning October 1, 2016, the monthly payments should instead be applied first to petitioner's arrearages in five other obligations, including alimony and child support.

**[*12]** But petitioner discharged the entirety of his alimony and child-support arrearages in 2016. His payments during 2017 and 2018 were applied first to the arrearages on his other two past-due obligations (attorney's fees and insurance premiums totaling $125,023). The remainder, or $474,977, was applied to the unpaid balance of his property settlement obligation.

In sum, we cannot read the October 2016 Consent Order in isolation. Rather, we must read it in conjunction with the Divorce Decree and the Superior Court's prior orders, which collectively constitute the "divorce or separation instrument." *See* § 71(b)(2). The Superior Court's prior orders contained an explicit "nonalimony designation" for the $25,000 monthly payments, directing that they be allocated to the unpaid balance of petitioner's $3 million property settlement obligation. The October 2016 Consent Order modified these prior orders in only one relevant respect—by directing that a portion of the 2016 payments be allocated to petitioner's arrearages in alimony and child support. This may have entitled him to a modest alimony deduction in 2016. But because the entirety of his payments during 2017 and 2018 were allocated to nonalimony obligations—chiefly the property settlement—he is entitled to no alimony deduction for either year.

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*An appropriate order and decision will be entered.*